Statement of the Oase.
NICHOLLS, C. J.
The plaintiff prayed for judgment for $3,000, with legal interest from judicial demand for damages.
He alleged: That on or about the 28th of November, 1901, on the public highway leading from Carterville to Horse river, at Martin’s Creek Bridge, in the presence of 35 or 40 citizens of the parish of Bossier, the defendant, with a view of injuring his character and good name, in wanton disregard of petitioner’s rights, falsely, maliciously, and wickedly charged and accused him of having committed the infamous crime of arson, by setting fire to and burning a house cornerib, with its contents of corn and fodder, belonging to Joe Zachary, on a night or two before, during the month of November. That the said charge and accusation publicly made in the presence of the parties named was made deliberately. That it was without cause, false and malicious, and made by defendant with the wicked intention and for the purpose of injuring him in the esteem of, his friends and the community, and to destroy the confidence of the public in him, and to bring him and his family into disgrace and shame.
That defendant had considerable means and influence in the community, and his false and malicious charge and accusations had damaged him, by injuring his reputation, and lessened the esteem of his neighbors and friends, and humiliated him. That he had lived in the community where the charge was made for many years. That he had the respect of the community, and that he had been injured in reputation and financial and social relations in the sum prayed for. He prayed for trial by jury and for general relief.
The defendant answered. He averred: That oil or about the-day of November, 1901, in the nighttime, the cornerib, with the corn and fodder therein, belonging to Joe Zachary, in Ward 4 in Bossier parish, was burned, and, from appearances and circumstances, was the work of an incendiary.
That a day .or two thereafter he made, in connection with other citizens of said ward and parish, honest, faithful, and diligent search to ascertain the guilty party or parties, and, from all the facts and circumstances disclosed by the investigations by himself and others, he, with others, was led to the belief that plaintiff was the guilty party, and he and others so stated to plaintiff and others there assembled at the time and place mentioned in the petition. That this belief was honest and based upon reasonable grounds. He denied that he gave unnecessary publicity to his belief and that of his coworkers in the guilt of the plaintiff, or that in so accusing or charging him he was actuated by malice, or a desire or purpose of injuring plaintiff in. reputation or otherwise in the community in which he lived or elsewhere.
That not until after the investigations aforesaid had led him and others then and there present, as stated in the petition, to the belief that the plaintiff was the guilty party, as aforesaid, did he make the charge or accusation against him, and he then did so only in the performance of a duty he owed the public and the state of Louisiana.
He averred further that after an investigation of the case the grand jury of Bossier parish returned a bill of indictment against plaintiff for the alleged arson of the cornerib aforesaid.
The case was tried by, a jury, which returned a verdict in favor of the plaintiff against the defendant for $200 and costs. The defendant made an unsuccessful application for a new trial, and, the court having rendered judgment in conformity with the verdict, defendant appealed.
Plaintiff’s counsel stated at the • bar that he had forwarded to be filed an answer to the appeal, in which he prayed for an increase of the judgment in plaintiff’s favor, but it must have miscarried in some way. The petition in the ease was filed on January 20, 1902.
The defendant is a merchant at Carterville, in the northern part of Bossier parish. About two miles and a half east of this town, and on the road leading from there towards Horse river, lives the plaintiff, a farmer, owning about 160 acres of land. Covington’s house and outbuildings axe on the south or right-hand side of the road, going away from Carterville, His house faces the road, but is about 60 feet from it. In front of the *329 house is a space referred to in the evidence as a “stamp,” open from the public road up to the yard fence which incloses plaintiff’s residence. To the right of this “stamp” are two lots of Covington’s—the first a cow pen, which is directly upon the public road, and just behind this pen a small horse lot, which has a gate opening into this stamp.
Further away from Carterville, and about half a mile from Covington’s house, are the residence and outbuildings of one Zachary, who owns and cultivates a small tract of land, which he had purchased from the defendant, Roberson. The buildings and outbuildings on Zachary’s tract face the public road, but they are on the opposite side from those of Covington.
In between Covington’s place and that of Zachary, Martin’s creek crosses the public road, and the creek is there crossed by a bridge. The creek at that point runs nearly north and south, but it soon shifts to the west on the left-hand side of the road, and runs nearly parallel to it, in a general easterly and westerly direction. On the eastern side of Martin’s creek (the side of the creek nearest to Zachary’s property) there is a swamp, which extends on both sides of the public road. A small branch empties into Martin’s creek on the left-hand side of the road, a short distance to the left of the bridge, and on the side of the creek next to Zachary’s. This branch runs for a short distance north and south, and then shifts to the west, and runs parallel to the road, and in front of Covington’s property. It is skirted on the southern side next the road by a little path, which crosses it just before it empties into the creek, and ending at the public road, next to the left-hand side of the bridge. A small path runs parallel to the public road, on its right-hand side as it leads from Carterville to the bridge. It commences at the. bridge, passes in front of Covington’s house and lots, and in front of or across the “stamp” referred to, on towards Carter-ville.
On the night of November 27, 19Q1, the corncrib on Zachary’s place was burned, with its contents of corn and fodder. Several neighbors reached the spot during the night or early in the morning, and in the afternoon of that day several parties met at the place of the fire in order to investigate into the facts connected with it. Among these were Roberson (the defendant in this suit, with whom Zachary had in the meantime communicated in person), Mays (a friend of Roberson, from Carterville), Styles, two men of the name of Wallace, and Zachary. In the interview between Zachary and Roberson, the former communicated to the latter his belief that the plaintiff!, Covington, had set fire to the crib; and Roberson, impressed by Zachary’s statements, went to the crib with the same belief. We think the testimony fairly shows that all the parties who were at the place of the fire on the afternoon in question were under the same impression before they left the spot to make any investigation into the facts of the case. Zachary, Styles, and the two Wallaces started from there to make investigations. According to their testimony, they struck a track of a man’s shoe at some distance, moving around Zachary’s field toward the bridge. They occasionally lost the track, but refound it, and traced it to the public road on the side of the creek next to Zachary’s. They went back towards Zachary’s over the same ground they had traveled; finding, they say, the same track which they had traced from the crib to the bridge, going from the bridge towards Zachary’s. They did not go the whole distance back, for Roberson and Mays, who had not been with them on their way out, but were riding back along the public road to the bridge, joined them from across Zachary’s field, and the whole party turned back to the bridge. The.party stopped at the bridge, and some discussion took place there. In a few moments some of the party (though not Roberson) crossed the bridge over to the side of the creek next to Covington’s. In their testimony they say that the track was lost on the bridge, but it was found again on the path a little distance from the bridge, and on the side of the public road leading to Oovington’s property; that they traced it as far out as Covington’s cow pen. At that point, at the suggestion of Mays, all further investigation stopped, and the party returned to the bridge and separated. One of the investigating party did go to Covington’s gate and spoke to his wife, but he says he made no examination after he left the cow lot to see whether the track left the path and went out to Covington’s house. Mays and *331 Roberson on their return to Carterville passed in front of Covington’s house, but neither looked to see what became of the track. We are satisfied from the testimony that all the party who were at the bridge had, before they crossed it and examined the tracks beyond it, made up their minds that Covington was the party who had set fire to the crib. During that night various parties were sent out to the citizens of the Fourth Ward, requesting them to meet the next morning to investigate the fire. Zachary, Roberson, and a young lad who lived at Roberson’s were active in having notice to this effect given out. In consequence of this notice, over 50 citizens of the ward met the next morning at the bridge. Covington was present at the meeting. So was the justice of the peace of the ward. The whole party proceeded out to the burnt crib. While they were at the crib, and before any examination commenced, Roberson announced openly that the man who burned the crib was in the crowd. The party then went over the same ground which had been followed the night before, examining more or less the tracks. Covington offered to place his foot in the track, but was not allowed to do so, the reason assigned being that the shoe track was of a No. 9 shoe, and too many men in the crowd were wearing that number of shoe. The president of the meeting, however, did put his foot in the track, and it fitted exactly. When the crowd reached the bridge it stopped, and a meeting was called to order by Roberson, who suggested that Mr. Garrett preside, which he accordingly did. Precisely what he said on doing so is not shown, but Roberson called for a statement from Zachary. Zachary made a statement, and was then followed by a statement from Roberson, and it was the statement made at this time by Roberson which gave rise to this action. Several parties were called on to give their opinion—among others, Mays— but they declined doing so; Mays saying “he had only gone there, as a citizen, to try to investigate the thing and find the trouble.” Ailum Cone of defendant’s witnesses) testified that “the first proposition after Mr. Roberson had made his statement and Zachary had made his statement as to who was the guilty man was, all that believed Mr. Covington to be the man, to ‘get on the other side of the bridge,’ and no one got over there at all. The people got off the bridge, and the second proposition was, would it be agreeable to take a secret ballot as to how the people stood on the matter.”
It appears that, when this secret ballot was taken, 32 expressed their opinion that Covington was the guilty party, and 18 that he was not, and there was 1 blank vote. Although this was the result of the vote given, nothing was done by any one present in the way of taking legal steps against Covington, though the justice of the peace was on the spot. Covington, as a witness on the stand, being asked what, if anything, did Mr. Roberson say about going to law with this matter, answered: “Well, he asked Mr. Garrett if he was willing for it to go to law, and Mr. Garrett asked me if I was willing for it to go to law, and I told them I was perfectly willing for it to go to law and have a trial, if they thought I was guilty, and they said, ‘All right.’ I turned to Mr. Garrett, the justice of the peace, and told him that I knew nothing about law, nor nothing of that kind, and asked him what was the proper step>s for me to take in the matter, and he said: Well, Alec, I see nothing to convict you of the matter, and nothing to show that you have done it, and I would go on and pay no attention to it. If they send after you, I would go on; and, if they don’t, I would go on and pay no more attention to it.’ Then Mr. Roberson says: ‘Mr. Garrett, see if he is willing to drop it.’ And Mr. Garrett asked me if I was willing to drop it, and I said: Well, gentlemen’ ”—
Before he concluded the sentence he was asked: “Did he give any reasons why he wanted it dropped?” to which he answered: “No, sir. I said: ‘Well, Mr. Garrett, it seems to me that this thing has been fixed up and put off on me. I am willing to do what is right about it, and it is with you all to manage it. It is just what you say.’ I think, as near as I can remember, that is the remarks. Of course, I was bothered. I was not expecting anything like that. I was not thinking of such a thing, and it just simply got away with me. I was never gotten away with worse in my life.”
This meeting was held on the 29th of November, 1901. The present shit was filed on the 20th of January, 1902. On the 29th of *333 January, 1902, the grand jury of Bossier parish found a true bill against the plaintiff for having “willfully and maliciously set fire to and burned the corncrib and stable of J. M. Zachary in the nighttime.”
The case went to trial. The district attorney said his recollection of the case was that a nolle prosequi was entered in the case, instead of asking the jury to acquit him, but the record discloses that the jury returned a verdict of not guilty. The probability is that the verdict was rendered in consequence of objection having been made to a nolle prosequi.
In the Zachary testimony, he testified that several years before the burning of his crib, in November, 1901, Covington had struck him in the face, but he said that the difficulty between them had ended then and there, with the blow, and they had been good friends since; that Covington had struck him because, on his returning to Covington a mule which he had hired from him, which was lame, the latter complained to him of something he had told, and he had said that anybody who had said that was a damned liar; that he had not told Covington that he was a damned liar.
On cross-examination he made the following answers to questions propounded to him:
“Q. You didn’t whip Covington, did you?
“A. No, sir.
“Q. He got the best of it?
“A. There was only lick passed.
“Q. You stopped then?
“A. Yes, sir.
“Q. You and him friends?
“A. Yes, sir.
“Q. Nothing more said about it?
“A. That is right.
“Q. Is it not a fact that, during the summer and fall before your crib was burned, that Covington would cut wood for you when you were sick?
“A. Well he might have cut wood. He came out and waited on me.
“Q. Brought in your wood and made your fires?
“A. Yes, sir. I did the same for him.
“Q. And did not his wife cook up provisions and carry to your wife?
“A. I don’t know whether she did or not. They was mighty kind to us.
“Q. He never charged you anything for services rendered?
“A. In sickness, certainly not.
“Q. Mr. Covington treated you nicely, as a good neighbor?
“A. Yes, sir.
“Q. You had no complaint to make?
“A. None at all at him whatever.
“Q. Wouldn’t .it look strange that a man like that should burn your crib?”
Question objected to and abandoned. The same matters here testified to were made by Zachary in his remarks before the meeting in answer to questions propounded to him by Covington.
Roberson, in his testimony, said he had not talked to any one anything more than Zachary; that he. always tried to mind his own business and never make a tattling horn; that he went on until things turned out like they did, and that was the reason why he expressed his opinion like he did; that he honestly believed he was the man; he did not say that he did it.
Zachary’s cribs and fences had been burned several times, and it was because of the fact that his fence had been broken down and burned upon the same day that his difficulty with Covington about the mule occurred, and tracks on each occasion were seen leading in the direction of the bridge towards Covington’s house, that Zachary suspected Covington. Zachary had had at different times his cotton and fences burned, and he informed Roberson that he suspected Covington was the guilty party, and his reasons for supposing so, and these statements evidently found lodgment in Roberson’s own mind.
The number of times that Zachary’s fences and cotton were burned had created doubts among some persons as to whether they were not attributed to himself. There is testimony in the record going to show that some one had circulated to a limited extent the rumor that Covington was the party who had set fire to these fences and to houses, but it does not seem to have received any credence, and no one pretends to háve traced the origin of the same. Zachary claimed to entertain suspicions on this subject, and it is suggested that this rumor originated with him, and this is quite probable.
Defendant, in his brief, submits the following points and authorities:
“(1) It is not only the lawful right but the civil duty of every citizen to set on foot criminal proceedings whenever he believes honest *335 ly and on reasonable grounds that a crime has been committed. Dearmond v. St. Amant, 40 La. Ann. 374, 4 South. 72; Vinas v. Ins. Co., 33 La. Ann. 1265.
“(2) Statements made bona fide upon the subject-matter are privileged, and not actionable. Lynch v. Febiger, 39 La. Ann. 386, 1 South. 690; 18 Am. & Eng. Ency. of Law (2d Ed.) pp. 1029, 1037, 1039. Actions of this kind have never been favored, and, in order to sustain them, a clear case must be established. Mandeville v. Huston, 15 La. 281; Ney v. Richard, 15 La. Ann. 605; Staub v. Van Benthuysen, 36 La. Ann. 467; Girot v. Graham; 41 La. Ann. 511, 6 South. 815; Brelet v. Mullen, 44 La. Ann. 194, 10 South. 865.
“(3) In an action for damages for slander, malice is the essence, and it must be proved, in order that plaintiff may recover. Townshend, Slander & Libel, § 421; Curtis v. Moss, 2 Rob. 367; Barton v. Kavanaugh, 12 La. Ann. 333; Blass v. Gregor, 15 La. Ann. 421; Murphy v. Redler, 16 La. Ann. 1; Haney v. Trost, 34 La. Ann. 1146.
“(4) The grand jury found a true bill against the plaintiff, and the fact that this was so, and that 32 citizens out of 50 voted that it was their belief that plaintiff was guilty, are strong circumstances that there was probable cause. Grant v. Deuel, 3 Rob. 21.
“(5) The slander became merged in the prosecution, and, if the prosecution is not actionable, neither is the slander. Vinas v. Merchants’ Mut. Ins. Co., 33 La. Ann. 1265; Dearmond v. St. Amant, 40 La. Ann. 374, 4 South. 72; Enders v. Boisseau, 52 La. Ann. 1020, 27 South. 546.
“The indictment was the result of the slander charged, and, as the greater includes the less, and there is no complaint as to the indictment or prosecution, the plaintiff shows no cause of action. No case can be found where, after slander has been merged in an indictment and prosecution, an action has been maintained for the slander thus merged. If plaintiff has any action, it is for malicious prosecution.
“(6) Probable cause does not depend on the actual state of the case, in point of fact, but on .the reasonable belief of the prosecutor. However innocent the plaintiff may have been of the' crime charged, it is enough for defendant to show that he had reasonable grounds for believing him guilty at the time the charge was made. State v. Cazeau, 8 La. Ann. 113; Talbert v. Stone, 10 La. Ann. 537; Pellenz v. Bullerdieck, 13 La. Ann. 274; Weil v. Israel, 42 La. Ann. 955, 8 South. 826; Mosley v. Year-wood, 48 La. Ann. 334, 19 South. 274. Rumors are not, but the representations of others are, foundation for such belief. Mosley v. Yearwood, 48 La. Ann. 334, 19 South. 274; Sandoz v. Veazie, 106 La. 202, 30 South. 767.
“(7) An acquittal is no proof of want of probable cause. Reason of the Rule [Grant v. Deuel] 3 Rob. 21, 38 Am. Dec. 228; Gerber v. Viosca, 8 Rob. 150; Talbert v. Stone, 10 La. Ann. 537; Godfrey v. Soniat, 33 La. Ann. 919; Vinas v. Insurance Co., 33 La. Ann. 1266; Staub v. Van Benthuysen, 36 La. Ann. 467.
“(8) Verdicts of juries in cases like the present are frequently set aside by the Supreme Court. See Sandoz v. Veazie, 106 La. 202, 30 South. 767, and cases cited; Digard v. Michaud, 9 Rob. 387; Gilbert v. Palmer, 8 La. Ann. 130; Talbert v. Stone, 10 La. Ann. 537; Pellenz v. Bullerdieck, 13 La. Ann. 274; Ellis v. Board of Com’rs, 43 La. Ann. 33, 8 South. 914.”
The plaintiff submits the following points and authorities;
“(1) If any one unlawfully interferes with the fights which every citizen has of enjoying that degree of respect, good will, and social standing to which his own acts and habits entitle him, by making or circulating slanderous reports, he renders himself liable in damages. Williams v. McManus, 38 La. Ann. 161, 58 Am. Rep. 171; Ellis v. Boards of Com’rs, 43 La. Ann. 867, 8 South. 914; Harris v. Minvielle, 48 La. Ann. 908, 19 South. 925.
“(2) Every repetition of a slander originated by a third person is a willful publication of it, and renders the person repeating it liable. Talebearers are as bad as taletellers;, nor is it any defense that the speaker did not originate it, but heard it and believed it. Harris v. Minvielle, 48 La. Ann. 908, 19 South. 925.
“'(3) To charge an innocent man with burning a house is slanderous per se, and the-law implies malice, even if none be proven. Staub v. Van Benthuysen, 36 La. Ann. 469; Williams v. McManus, 38 La. Ann. 161; Taylor v. Ellington, 46 La. Ann. 371, 15 South. 499.
“(4) Malice does not always mean spite against an individual, but malus animus—a *337 wanton disregard of the rights of others. Perret v. New Orleans Times Newspaper, 25 La. Ann. 170; Savoie v. Scanlan, 43 La. Ann. 967, 9 South. 916, 26 Am. St. Rep. 200; Weil v. Israel, 42 La. Ann. 955, 8 South. 826.
“(5) Probable cause means the existence of such facts and circumstances as would excite the belief in a reasonable mind that plaintiff was guilty. Mosley v. Yearwood, 48 La. Ann. 334, 19 South. 274.”
Opinion.
This case is submitted to usi by defendant without any complaint as to the instructions which were given by the court to the jury, and the charge itself is not in the record. As has been usual since the passage of the statute allowing objections to testimony to be noted by the clerk or stenographer in the note of evidence to stand in lieu of a formal bill of exceptions, a great many such objections were made on both sides, but none have been, particularly called to our attention.
We are substantially left to decide the issues upon the weight and sufficiency of the evidence, and through the application by ourselves thereto of general principles of law bearing upon the subject-matter of slander. In this class of cases the findings of the jury will not be disturbed unless clearly erroneous, improper, and not sustained by any correct view of the evidence. King v. Ballard, 10 La. Ann. 557; Mohrman v. Ohse, 17 La. Ann. 64; Sibley v. Lay, 44 La. Ann. 936, 11 South. 581; Am. & Eng. Ency. of Law (2d Ed.) p. 1012.
Defendant is not charged by the plaintiff with having caused him to be falsely arrested or imprisoned, or to have maliciously prosecuted him.
The record shows that defendant was in fact indicted, but that he was subsequently acquitted. We presume he was arrested under the indictment, but the party at whose instance this arrest or prosecution was made does not appear. The grand jury’s a'ction may have been based consequentially upon defendant’s statement at the public meeting of citizens referred to in the statement of facts, and the action of the citizens taken at that meeting.
Defendant, in his testimony, declares that he did not at the meeting charge that plaintiff had burned Zachary’s corncrib; that he had only expressed his belief that he had done so. The averments of the defendant’s own answer and the testimony of several witnesses go to show that his statement went further than this. Be this as it may, it is well settled that slanderous words may be actionable even though they do not consist of an unequivocal and positive assertion concerning another, and in numerous cases it has been held that words were actionable where the defamatory charge was couched in the form of an expression of belief. Thus it has been held that the words, “I believe that Giddens burnt the camp ground,” were actionable. Giddens v. Mirk, 4 Ga. 364. So, also, the words, “I am thoroughly convinced that you are guilty.” Oldham v. Peake, 2 W. Bl. 960; 1 Cowp. 275; Am. & Eng. Ency. of Law, pp. 971, 972.
Defendant, a man of position and influence in the community in which he lived had used the words he did in addressing a body of men called together for the purpose of expressing at an irregular time, and in an irregular manner and method, their opinion as to the guilt or innocence of the plaintiff upon a charge of arson.
In addressing a jury, it is not permitted to add to the probative force of the'testin^ony adduced upon the trial of a criminal case the influence of a personal belief as to the guilt of accused parties; and, if this be so in an address to men acting under the solemn responsibility of official oaths, it is much more strongly so in an address to men met together to consider under conditions likely to lead them to violent and inconsiderate conclusions in dealing with an accusation against a person of the commission in their midst of such a crime as arson.
Defendant calls to our attention expressions drawn from several decisions of this court as to the protection due to parties aiding the state and parish authorities in the investigation of and detection of crime. The expressions used were thoroughly correct in the abstract, and as applied to the facts of the particular case in which they were employed, but the circumstances of this special case were peculiar. The corncrib of Zachary was burned on the night of the 27th of November. The next day (the 28th) some four or five citizens of the neighborhood (de *339 fendant among them) went to the place where the fire had occurred for the purpose of investigating the facts of the case. Before leaving that place or making any examination at all, they concluded (doubtless from statements made by Zachary) that Covington had committed the act, and, after having so concluded, started to make an inspection of the ground in the neighborhood. In doing this they discovered at some little distance from the crib the track of a No. 9 shoe, which they followed—sometimes, as they testified, losing and again finding it—until it reached the public road near the bridge crossing Martin’s creek. Here the investigating party stopped, adhering to their belief that plaintiff was the guilty party. After some discussion the party (not including the defendant) crossed the bridge, and, after doing so, followed along a little path, which, running parallel to the public road which led from the bridge to Carterville, passed in front of plaintiff’s property. The party lost the track upon the bridge, but say they found it again upon the path beyond, and traced it as far as the cow pen upon .plaintiff’s property, which adjoined the public road. Just at this point—the very point at which the investigation would have been given some probative force, had the track led up to plaintiff’s house or door—the investigation ceased, and the parties, without following the path further along the public road past Covington’s property towards Carterville, turned back to the bridge, there separating for the night; continuing to hold the same views which they had had at first as to the guilty party. Instead of acting upon the strength of this belief as to Covington’s being the guilty party, by making an affidavit before the justice of the peace of the ward, or any of the officials authorized to act in the premises, Zachary and the defendant, themselves and through others, at once notified the citizens of the Fourth Ward to meet at the bridge the next morning to investigate matters, and at that time 50 or more citizens of the ward answered the call. After they had assembled at the bridge, they proceeded in a body to the locality of the burnt crib, whence they passed over to some extent the same ground which had been passed over the day before by the citizens, noting the same tracks which they had seen. While on their way, the plaintiff offered to place his foot in the track, so that a comparison of feet might be made, but his offer was declined. Mr. Garrett, however, who presided, placed his foot in the track, and they were found to correspond. The track was that of a No. 9 shoe, which the evidence showed was a size of shoe very much used by the people in the neighborhood. This second investigation was carried no further than the bridge, and upon their arrival at this point the citizens were organized into a mass' meeting. Mr. Garrett, at the suggestion of defendant, being called upon, made a statement as to who he believed to be the party who had burned the crib, and gave it as his opinion that plaintiff was the man, and his statement was followed by one from the defendant to the same effect. After these statements had been made, it was moved that ail parties who believed that plaintiff was guilty of the charge made should pass over to one side of the bridge, but no one responded, and it was next proposed that a secret ballot be taken upon the same matter. The result was that 32 voters believed plaintiff was guilty, and 18 that he was not. Notwithstanding this result, no affidavit was made against plaintiff, although the justice of the peace was present. Precisely what happened after this vote was taken does not appear, but the citizens dispersed without any action being taken against the plaintiff until after the present suit was instituted. A few days after the filing of plaintiff’s petition, an indictment was returned against defendant for the crime, but on the .trial of the case he was acquitted of the charge. The calling together, under the circumstances of this case, of the citizens of the Fourth Ward by Zachary and the defendant, does not impress us as a bona fide effort and intention on his part to bring about an investigation which should load up to the prosecution of the party who might be guilty of the burning of the former’s eorncrib. The whole course pursued had a direct tendency to withdraw the subject sought to be investigated from examination by the state authorities, but to submit the whole matter to a meeting of the people likely to take the law into their own hands. It is very fortunate that public feeling was not brought in this instance to a condition of greater excitement than it seems to have reached, for, had such been the case, there *341 would have been greater danger of a violation of, than a vindication of, law.
To bring statements slanderous in character under the operation of statements which are privileged because they were made in the prosecution of an inquiry regarding a crime which had been committed, and for the purpose of detecting and bringing the criminal to punishment, they should be made, ndt to private individuals, but to an officer of the law, in good faith, and in aid of charges to be legally made, and of punishment to be legally inflicted. It has been held in some jurisdictions that words spoken in the absence of pending investigation are not privileged. Callahan v. Ingram, 122 Mo. 355, 26 S. W. 1020, 43 Am. St. Rep. 583; McGaw v. Hamilton, 184 Pa. 108, 39 Atl. 4, 63 Am. St. Rep. 786; Burlingame v. Burlingame, 8 Cow. 145.
Defendant claims that it is essential to a civil action for damages for slander.that malice should be alleged and proved. Upon this subject it is stated in the Am. & Eng. Ency. of Law, p. 998 et seq., that, “in regard to whether malice is a necessary ingredient of libel or slander, there are two views asserted by the' authorities. The first, which has been many times asserted and reiterated, and is undoubtedly supported by the great preponderance of authority, is that the gist of an action or prosecution for libel or slander is the malice of the defendant in publishing or uttering the defamatory words. The authorities, however, have divided malice into kinds—actual or express malice, or malice in fact, and implied malice, or malice in law—and hold that the latter alone is necessary, in the case of publications or communications not privileged, to maintain a civil action, and recover the actual damages sustained by him, and that such malice will be presumed from the mere publication of or utterance of words which are per se libelous or slanderous, especially if the words be false, while express malice, or malice in fact, is not usually presumed, but must be proved, and is necessary only to entitle the person defamed to recover punitive or exemplary damages, or to rebut the inference arising from a qualified privilege, or to authorize a recovery where the words are not actionable in themselves. The better view, undoubtedly, is that, except in the ease of communications or publications which are qualifiedly privileged, malice on the part of the defendant in uttering or publishing the defamatory words is not necessary to entitle the plaintiff to recover in a civil action all the actual damages which he has sustained by reason of the libel or slander, but may be shown to entitle the plaintiff to recover punitive or exemplary damages.” The law in Louisiana is that every act of man which occasions injury or damage to another obliges him by whose fault it has been caused to repair it. Oiv. Code, art. 2315. All that is necessary here for a party demanding such damages from another is to allege a condition of things such as would show a “fault” on the part of the defendant, resulting in damages and injury to himself therefrom, and on the trial of his case to establish the truth of his allegations. Plaintiff may recover .compensatory damages, regardless of whether there was any actual malice or not. The question of actual malice only arises when punitive damages are claimed.
Defendant urges that the finding by tbe grand jury of an indictment against plaintiff for the crime with which defendant accused him relieves him of the imputation of having acted maliciously or without probable cause.
The finding of an indictment against a person gives rise to a presumption of criminality on the part of the party accused, and to a presumption that the party who made the charge against him on which the indictment was based had acted on probable cause, for a limited time, and to a limited extent, and for limited purposes. The presumption of innocence follows the accused until conviction. When the district attorney enters a nolle prosequi, or the jury acquits the accused, presumptions as arising from the mere fact of the finding of the indictment disappear, and the matter of probable cause in having made the charge covered by the indictment is set at large. In Pennsylvania the doctrine has been laid down that, where an alleged slander charges an indictable offense, the presumption of innocence ought to and must stand as prima facie evidence óf falsity and want of probable cause, and therefore of malice, except in ease of a qualified privilege. Am. & Eng. Ency. of Law, p. 1029.
In the same work, on page 1074, the rule is stated that, when the publications of libelous or slanderous matter is shielded by no privilege, it will be no defense, either in a civil or criminal proceeding, that the defendant in *343 good faith believed the charge to be true, and otherwise acted without malice, and that the fact that the defendant had probable cause for such belief does not alter the rule. We have carefully examined the evidence in this case, and we would not be authorized to set aside the verdict of the jury or the judgment of the' district court. Assuming that defendant was honestly convinced that plaintiff was guilty of the crime with which he charged him, he reached his conclusions upon statements made to him by Zachary, which, when stated, should have carried no probative force to any reasonably prudent man, and the circumstances of which he himself had personal knowledge were totally insufficient to have justified him in making the charge he did.
For the reasons herein assigned, it is hereby ordered and decreed that the judgment appealed from be, and the same is hereby, affirmed.