(74 South. 190)

No. 20750.

HALL v. EWING et al.

(Jan. 15, 1917. Rehearing Denied Feb. 12, 1917.)

*(Syllabus by the Court.)*

1. PLEADING ☞310—LIBEL AND SLANDER—EXHIBITS—QUESTION FOR COURT—CONCLUSIONS OF FACT—SUPPORT IN FACTS.

Under the practice of this state, where the whole case is developed by the petition and the documents attached thereto, the facts as recited or alleged are looked at to judge whether the conclusions of fact, drawn by the pleader are within the scope of the facts recited. The court is to say whether the facts charged are a legal foundation for the conclusions of fact drawn therefrom. Following this rule the inferences or interpretations placed upon the exhibits must be drawn from these exhibits or there is no case; this is peculiarly so here (in a case of libel), where the pleader points to the exhibit itself as showing its meaning to be what he says it means. It is perfectly clear that up to this point in the history of the case the exhibits are the case, and if they do not support the charge and do not show a cause of action, then an exception of no cause of action is good.

[Ed. Note.—For other cases, see Pleading, Cent. Dig. §§ 345, 944, 946, 947.]

2. LIBEL AND SLANDER ☞4, 80 — ACTION — ALLEGATIONS — COMPENSATORY DAMAGES — MALICE.

The better view, undoubtedly, is that, except in the case of communications or publications which are qualifiedly privileged, malice on the part of the defendant in uttering or publishing the defamatory words is not necessary to entitle the plaintiff to recover in a civil action all the damages which he has sustained by reason of the libel or slander, but may be shown to entitle the plaintiff to recover punitive or exemplary damages. The law in Louisiana is that every act of man which occasions injury or damage to another obliges him by whose fault it has been caused to repair it. Civ. Code, art. 2315. All that is necessary for a party demanding damages from another is to allege a condition of things such as would show a "fault" on the part of the defendant, resulting in damages and injury to himself therefrom, and on the trial of his case to establish the truth of his allegations. Plaintiff may recover compensatory damages, regardless of whether there was any malice or not.

[Ed. Note.—For other cases, see Libel and Slander, Cent. Dig. §§ 111, 184–186.]

3. LIBEL AND SLANDER ☞51(1), 54—ACTS OF PUBLIC OFFICER — CRITICISM — TRUTH — MALICE.

The official acts of a public functionary may be freely criticized and entire freedom of expression used in argument, sarcasm, and ridicule upon the act itself, and then the occasion will excuse everything but actual malice and evil purpose in the critic; the occasion will not of itself excuse an aspersive attack upon the character or motives of an officer, and to be excused the critic must show the truth of what he has uttered of that kind.

[Ed. Note.—For other cases, see Libel and Slander, Cent. Dig. §§ 149, 152.]

Provosty and O'Neill, JJ., dissenting.

Appeal from Civil District Court, Parish of Orleans; Fred D. King, Judge.

Suit for libel by Luther E. Hall against Robert Ewing and others. Exception of no cause of action sustained, suit dismissed, and plaintiff appeals. Affirmed.

Caffery, Quintero & Brumby, of Franklin, and J. Zach Spearing, of New Orleans, for appellant. Dart, Kernan & Dart and Stirling Parkerson, all of New Orleans, for appellees.

SOMMERVILLE, J. This suit for libel is set forth in the petition as follows:

"The petition of Luther E. Hall, a resident of the parish of Ouachita, and now residing, as Governor of Louisiana, in Baton Rouge, respectfully represents:

"(I) That petitioner is by profession an attorney at law, and that, for many years, he has devoted himself to the practice of his profession, and to the discharge of his duties in the several offices of trust to which he has been elected.

"That he is now filling the office of Governor of this state, for a term beginning in May, 1912; that when he received the nomination for Governor he had been elected to the Supreme Bench of Louisiana, from the Second Supreme Court district, but did not take his seat as Associate Justice, by reason of his election to the Governorship; that previously he had served a term upon the bench of the Court of Appeal, Second District, and another term as judge of the Sixth judicial district court, in the parishes of Ouachita and Morehouse; and that he had also represented the Twenty-Fifth senatorial district in the state senate.

"(II) Petitioner further represents that he has faithfully discharged all his professional and public duties, and has lived uprightly and honestly, so as to gain the confidence of a wide circle of friends, and to enjoy a reputation for straightforward and honorable dealing; and that the loss of such confidence and of such reputation would fall not only upon him, but upon his family, and would cripple him in his future career, and in his future work for livelihood.

"(III) Petitioner represents that the Daily States, a newspaper published in the city of New Orleans, has lately published, and given wide circulation in New Orleans and throughout the state, to certain false, defamatory and libelous charges against petitioner, maliciously contrived and intended to injure him before the public.

"That on the 16th day of July, 1913, said newspaper published, and caused to be circulated and read by the public, an article hereto annexed, and made part hereof, marked Exhibit A.

"That said newspaper meant, in said Exhibit A, to charge and did charge that petitioner was a party to a deal in the public lands, which said newspaper claims was and is fraudulent; that petitioner had introduced a bill in the state senate in furtherance of said plan, or conspiracy, or deal, the introduction of said bill being chronicled as part of said plan, conspiracy or deal; that a fund to bribe the members of the board in charge of said public lands was paid out, by the purchasers of said land, with petitioner's connivance, aid, participation, or approval; that a case, setting forth the bribery, came before the court of which petitioner was then judge and that petitioner rendered judgment in said case in pursuance of his alleged approval, or connivance, aid, and participation in such corrupt transaction; and that petitioner has, since he became Governor, in making appointments on the new board, to succeed the one alleged to be bribed, as aforesaid, done so with the end in

view that the new board might consummate such corrupt transaction by compromising the case for its annulment, and for the recovery of said lands, all of which was false, wanton, malicious, and libelous, and was published and uttered for the purpose of causing it to be believed that petitioner himself was devoid of integrity notwithstanding the knowledge on the part of the proprietor and manager of said newspaper that said charges were without any foundation in fact.

"(IV) That the said newspaper has repeatedly published articles of the same general tenor as that quoted above, and for the purposes alleged above, and has dwelt with emphasis and significance upon the alleged fact that one of the alleged parties to the deal, described as aforesaid in said newspaper, was a personal and political friend of petitioner, and that such circumstance has been reiterated in such articles so as to convey the impression that petitioner has, in some way, participated in such alleged misconduct, or is otherwise responsible for it, and tainted with it, all of which is untrue, maliciously and defamatory libelous as was well known to the proprietor and management of said newspaper; one of said articles which appeared on the editorial page of said newspaper, on the 17th of July, 1913, being that annexed hereto, and made part hereof, marked Exhibit B.

"Petitioner alleges that the said Exhibit B is false, malicious, untrue, and libelous, for the reason stated above, and also because it sets forth and infers that petitioner was so compromised by his alleged connection with the history of the so-called land deal as to make it necessary for the preservation of his honor to take the course indicated and described by the said newspaper, thus describing him as deprived of his gubernatorial discretion by reason of the circumstances set forth in said newspaper.

"(V) That the defamation to which petitioner has been subjected, as aforesaid, has caused him great annoyance, and has wounded, harassed, and mortified him; that it has injured him in the estimation of the public, and of his friends and neighbors; and that, for reparation, and by way of punitive justice against such wanton and malicious attacks, he is entitled to recover from the responsible publishers of said newspaper the sum of one hundred thousand dollars ($100,000.00).

"(VI) That the Daily States is published by the Daily States Publishing Company, Limited, a corporation organized under the laws of this state and having its domicile in the city of New Orleans, of which Robert Ewing, also of the city of New Orleans, is the president and manager, as petitioner believes, and therefore alleges, and the said Robert Ewing as such manager directs and controls the policy of said newspaper, and that J. Walker Ross, also of the parish of Orleans, is managing editor of said newspaper, and that the said corporation, said Ewing and said Ross are responsible for the

utterances of said newspaper; that the aforesaid libel upon petitioner was conceived and prepared by said Ewing and said Ross for the said corporation and the said newspaper, and they used said newspaper for the dissemination of said libel, for the purpose of injuring, damaging, and harassing petitioner, and that they, the said corporation, the said Ewing and the said Ross are liable in solido for the damages set forth herein.

"Wherefore, petitioner prays that the Daily States Publishing Company, Limited, Robert Ewing and J. Walker Ross be cited to appear and answer hereto, and that after due hearing, that there be judgment in favor of petitioner and against the said Daily States Publishing Company, Limited, Robert Ewing and J. Walker Ross, in solido, for the sum of one hundred thousand dollars ($100,000.00), with legal interest from date of the judgment, and cost of court. Petitioner prays for general and equitable relief."

The exhibits attached to and made parts of the petition follow:

### Exhibit A.

"Pleasant will Not be Halted Except by Governor.

"Going to Monroe Aug. 1 to Take Default in Tensas Delta Scandal.

"Not Believed that Hall will Interfere.

"Presiding Judge in 1902 When Scandal First Tried; Decided for Lacey Estate.

"Summary of the Tensas Land Deal.

"July, 1898—Bill by Senator Luther E. Hall, now Governor Hall, passed removing the domicile of the Tensas Basin Levee Board from Rayville, Richland parish, to Monroe, Ouachita parish.

"September, 1898—Deal entered into between J. W. Brown, of Memphis, J. W. Simms, land agent of the board, and Jas. D. Lacey and associates and members of the Tensas Levee Board for the sale of the lands.

"October, 1898—The lines laid for the sale of 900,000 acres of land in the parishes of Richland, Ouachita, La Salle, Catahoula, Morehouse, Caldwell, Franklin, West Carroll, at 14½ cents per acre, James D. Lacey, in pursuance of the deal with Simms entered into in September, organized the Tensas Delta Land Company, Lacey and S. Wood Beal were placed in active charge of the company.

"November, 1898—The Tensas Delta Land Company organized and willing to spend $200,000 for the lands, although the lands were then worth at least $500,000; Tensas Levee Board transferred same to the company, through Jas. D. Lacey for $130,000.

"November 7th to 30—Division of the slush fund set aside to bribe members of the Levee Board, its employés and prominent men, amounting to $20,000 in cash and stock in the Tensas Delta Land Company, amounting to $18,750. Of this, the Attorney General charges, $3,000 in cash and $3,750 in stock, went to John P. Parker, Sr., personal and political friend of Governor Hall, and then president of the Levee Board.

"1902—James W. Brown, who represented Jas. D. Lacey, and who, with J. W. Simms and J. D. Lacey, put the deal through, filed suit at Monroe for the liquidation of the Tensas Delta Land Company and for a division of the spoils.

"Same year—The case being No. 5634 of the docket of the Sixth District Court of Ouachita, the suit was tried before Judge Luther E. Hall, now Governor Hall, and all the facts were developed; judgment rendered against Brown in favor of the Tensas Delta Land Company and J. D. Lacey by Judge Hall.

"October, 1909—The Tensas Basin Levee Board, which succeeded the Parker board, learned for first time of the fraud that had been practiced by its predecessors in office, it being made clear that only John P. Parker, J. A. Helmer, R. E. Yancey and R. R. Blanks, who subsequently became president, were possessed of knowledge of the deal.

"November, 1909—Suit entered by the state of Louisiana against the Tensas Delta Land Company at Rayville for the purpose of setting aside the sale on allegations of fraud and bribery.

"March, 1910—Suit brought by the Attorney General on behalf of the Tensas Basin Levee Board against the Tensas Delta Land Company in conformity with a decision of the Supreme Court, and on motion of the land company was transferred to the United States Circuit Court, Western District of Louisiana.

"May, 1913—United States Circuit Court of Appeal, Judge Shelby speaking, reversed decision of Judge Boarman dismissing suit and sent the case back to the District Court for trial on the merits, declaring the courts should not allow wrong to triumph through mere technicality of pleading, etc.

"July, 1913—Tensas Basin Levee Board, appointed by Governor Luther E. Hall, now chief executive of the state, compromised the allegations of fraud for $100,000.

"Lands sold for $130,000 in 1898, now held to be worth $3,400,000.

"In the absence of specific orders from Governor Luther E. Hall, who is the only man in Louisiana authorized to call him off, Attorney General Ruffin G. Pleasant will, on August 1, 1913, move that judgment be entered in the United States Circuit Court at Monroe in favor of the state and the Tensas Levee Board by default.

"This action is predicated upon the assumption that Henry Bernstein and Edgar H. Farrar, attorneys for the Tensas Delta Land Company, will stand on the legality of the compromise which Mr. Bernstein put through at the meeting of the Tensas Basin Levee Board last Thursday at Rayville.

"No word has come from the executive rooms' at the St. Charles Hotel on the Tensas land scandal. Governor Hall, although declaring that he did not give his approval to the deal, has given no intimation of what he will do.

"Believe Governor will Not Interfere.

"The Tensas scandal, in the light of the attempted compromise, is a subject of comment all over the state. The opinion was expressed Wednesday here that if the Governor knew all the gossip in circulation he would not only refuse to check the Attorney General, but insist on his pressing the suit to trial.

"The Attorney General is understood to have a mass of evidence to be submitted in support of his case. In that connection it is said that if the case ever comes to trial the state may be able to show the distribution of every dollar of money and stock which was used in putting the deal over. It is no secret that when the state made its first investigation in the Sanders administration it was unable to trace one small block of stock.

"Although Colonel Pleasant received from Rayville the notarial deed which seals the compromise made by the Levee Board, the charge of fraud still stands so far as the state's legal department is concerned, there will be no compromising the record as it stands in the courts until specific orders come from the Governor.

"Colonel Pleasant Says Law and Duty Clear.

"'My authority comes from the Governor,' said Colonel Pleasant. 'Under Act 3, of 1910, Governor Sanders directed Attorney General Guion to take charge of the suit, and that authority has never been revoked by the Governor. I feel I must obey and respect that order.'

"'My action is clear,' continued the Attorney General, and he quoted the act under which he is prosecuting the case, which reads:

"'Be it further enacted by the General Assembly of the state of Louisiana, that it is hereby made the duty of the Attorney General of the state, upon the request of the Governor, to represent the Governor or any political agency or subdivision thereof in any suit in court involving the title of any land belonging to the state of Louisiana or any of its political agencies or subdivisions where the title of the land is vested in or appear in the name of the state or any of its political agencies or subdivisions.'

"Text of Compromise Made at Rayville.

"Following is the Compromise Made at Rayville:

"The Compromise.

"'Before me, the undersigned authority, personally came and appeared T. R. Gilbert, Sr., president of the Board of Levee Commissioners of the Tensas Basin Levee District, a political corporation created by the laws of the state of Louisiana and domiciled in the town of Rayville, in the parish of Richland, state of Louisiana, duly authorized and fully empowered to act herein for and on account of and in the name of the Board of Levee Commissioners of the Tensas Basin Levee District aforesaid, by a resolution of said board duly adopted in regular session on the 11th day of July, A. D. 1913, a certified copy of said resolution, under the corporate seal of said Levee Board, being attached herein and made a part of this act; and Tensas Delta Land Company, Limited, a limited liability partnership association, organized and created under the laws of the state of Michigan, with its domicile and principal place of business in the city of Grand Rapids, represented herein by Henry Bernstein, its general agent in the state of Louisiana, who is duly authorized to act for and in its stead and in its name in the matters herein set forth.

"'And the said appearers declare unto me, notary, in the presence of the undersigned witnesses, that in order to put an end to the litigation now pending between them in the suit entitled "Board of Levee Commissioners of the Tensas Basin Levee District versus Tensas Delta Land Company, Limited," being No. 694 on the docket of the United States District Court in and for the Western District of Louisiana in Equity, and to forever end and set at rest all of the matters and things set up and contained in the allegations of the original and amended bills of complaint filed in said cause, and forever to set at rest all questions relating to the validity of the titles of the Tensas Delta Land Company, Limited, to the lands situated in the parishes of Ouachita, Morehouse, Caldwell, Catahoula, Franklin, Richland, West Carroll, and La Salle, in the state of Louisiana, purchased by it from the Board of Levee Commissioners of the Tensas Basin Levee District on the 9th day of November, A. D. 1898, as appears by the seven deeds of said date, on file and of record in each of the seven parishes above named (the parish of La Salle having been created since said transaction), and to finally adjust and settle all disputes, differences and matters at issue between the Board of Levee Commissioners of the Tensas Basin Levee District and the said Tensas Delta Land Company, Limited, in any matter affecting the sale of said lands or relating thereto, or affecting in any manner the execution of said transaction and sale, and especially the matters and things set forth in the bill of complaint and amended bills of complaint herein above referred to. They have agreed, contracted and entered into the following act of compromise, which each of them prefers to the hope of gaining, balanced by the fear of losing, in said litigation, namely:

"'The said Tensas Delta Land Company, Limited, agrees to pay to the said Board of Commissioners of the Tensas Basin Levee District aforesaid, the sum of one hundred thousand and no/100 ($100,000.00) dollars, which payment is made contemporaneously with the signing of these presents, by delivery of draft for said sum payable ten days after presentation.

"'In consideration of said payment, the re-

ceipt of which is hereby acknowledged, the Board of Levee Commissioners of the Tensas Basin Levee District agrees to dismiss, at its cost, the litigation and suit now pending and herein above referred to, being suit No. 694 in equity, on the docket of the United States District Court in and for the Western District of Louisiana, entitled "Board of Levee Commissioners of the Tensas Basin Levee District versus Tensas Delta Land Company, Limited," from the docket of said court, and hereby authorizes the dismissal of said suit to be done either in open court or on motion filed by the Attorney General of the state of Louisiana, or the attorney of record of the Tensas Delta Land Company, Limited, to all of the lands specifically described in its seven deeds from said Board, set forth by government subdivisions, by metes and bounds or by tracts, and specially ratifies, confirms, approves and recognizes its act of compromise heretofore made by it, acting through its president, W. H. Holloman, under authority of a resolution of said Board, dated 9th day of July, 1913, with said Tensas Delta Land Company, Limited, and ratifies and confirms all acts by either of the parties thereto heretofore done or performed thereunder, it being expressly understood that this act of compromise above referred to, and intended to forever settle all questions as to the insufficiency of said previously executed act of compromise.

" 'This done, executed and signed on the date hereinabove written in the presence of the witnesses whose names are hereto subscribed, and by me, notary. Tensas Delta Land Company, Limited, by Henry Bernstein, Agent. Board of Levee Commissioners of Tensas Basin Levee District, by T. B. Gilbert, President. Witnesses: C. H. McHenery and W. S. Peck.

" 'G. F. Purvis, Clerk of Court.'

### "Too Late for Arrest.

"But Facts were Brought Out When Judge Hall Tried Brown Case.

"Special to The States.

"Monroe, La., July 16th.—District Attorney Odom, when asked as to why criminal prosecutions have not been attempted in the Tensas Basin Levee Board Case, stated that to his mind the prescription of more than one year would estop any criminal prosecutions.

"It is certain that the proper officers of the law had authentic knowledge of the alleged fraudulent transaction at least ten years ago. Mr. Odom was not district attorney when the sale was made, nor when the facts were developed in court.

"In 1902, J. W. Brown et al. entered suit against the Tensas Delta Land Company applying for a receiver of the company, alleging mismanagement. Brown was represented by Madison and Madison, one of whom was district attorney at the time, the Delta Land Company was represented by Hudson, Potts & Bernstein.

"On November 30, 1903, the case came up for trial before Judge Luther E. Hall, now Governor.

"Almost all of the sensational testimony which has since startled the people of the state was detailed at that trial. Governor Hall, then the presiding judge, rendered a decision in favor of the Tensas Delta Land Company. This case was appealed to the Supreme Court, but withdrawn on request of Brown.

### "Several Suits; Other Compromises.

"J. W. Brown is the man who now is ready to assist the Attorney General in prosecution of the case. He is the man who engineered the deal. Before Judge Hall was elected he was a state senator and introduced the bill to remove the domicile of the Tensas Basin Levee Board from Rayville to Monroe. Later he was elected district judge, and then it was that the first suit against the Tensas Delta Land Company was filed.

"During Governor Heard's term of office, while Senator W. T. Barnam was president of the levee board, H. Flood Madison, brother of the then district attorney, and Col. Frank Stubbs, represented the Levee Board. This case never came to trial as it was compromised.

"The next suit was filed by George Wesley Smith, who, it is said, obtained all of his facts from the record in the suit before Judge Hall. This suit was also compromised."

### Exhibit B.

### "The Governor's Duty to the State.

"The strange coincidence by which the latest phase of the malodorous Tensas land deal and the Dock Board imbroglio 'broke' together has left the Governor in the middle of a very bad fix.

"That he can ever retrieve his Dock Board blunder seems impossible. But if he will follow the path of duty so clearly blazed for him in the Tensas case, if he will apply there the principle he applied here of dismissing the board that refused to accept his policy, if he will put the honor of the state above the claims of personal and political friends caught in a disgraceful transaction and crying for his succor, if he will take his stand with the courageous young law officer of the state who refuses to sanction a compromise of fraud, it is not too late for him to save himself from the consequences of an infinitely greater blunder.

"It is unfortunate for the Governor that from its inception to the present time his name has been linked with this scandalous episode in the history of the state. He may be as innocent as the driven snow of any ulterior connection with the affair. But, by a strange concatenation of events, he has been placed in a relationship to it that requires on his part the utmost caution if his good faith is not to be impugned.

"It has been charged that the motive for moving the domicile of the levee board from the struggling village of Rayville to Monroe was to facilitate the consummation of the deal by which the Attorney General charges the taxpayers of the district were swindled. The Gov-

HALL v. EWING

ernor may have had no more knowledge of that purpose than the states. Yet it was the Governor, while state senator, who in 1898 introduced and passed the bill that effected the removal.

"After the deal was put through in the latter part of 1898, and the alleged 'slush' fund distributed among certain members of the Levee Board and the inner group that helped in the transaction, J. W. Brown, the agent of the Lacey Syndicate, sued those who made up the syndicate and asked a receiver for the land company. It was before Judge Hall that the case was tried, and, as our correspondent telegraphed us yesterday from Monroe, 'all the sensational testimony which has since startled the state' was developed at that trial. Judge Hall may have held the scales with an even balance;' the law and the facts may have left him no honest alternative; but the decision he rendered was against the agent and in favor of the syndicate, and it apparently prevented the institution at that time of the criminal proceedings which the facts justified.

"Among those who were thus protected, and whom the Attorney General has since charged in legal records with having shared in the slush fund is John P. Parker, then president of the board. Mr. Parker was then, as now, the personal and political friend of Governor Hall, and so close was and is their intimacy that it is Mr. Parker who is credited with having persuaded Judge Hall to make the race for Governor.

"Nor does the Governor's connection with the case end here. When the Supreme Court held that the state surrendered·her title to the lands in donating them to the Levee Board, and hence could not stand as plaintiff, Governor Sanders, under an act of the Legislature specially passed directed the Attorney General to appear for the Levee Board, and it was the Sanders board that instituted the suits now pending in the federal courts.

"The Sanders board has since gone the way of most of the Sanders officeholders. In its stead there was named a new board by Governor Hall. It is this board, responsible to the Governor for its acts and its policy, which has compromised the fraud charged by the Attorney General and again saved the Governor's intimate, personal and political friend and those whom the state alleges were the recipients of the corruption fund of the Lacey syndicate.

"We have said that the unfortunate association of his name so frequently with this unholy transaction does not of itself involve the Governor in either moral or legal turpitude. But can there be any question that, for his own sake and for the honor of the state, it leaves the Governor no alternative but to repudiate the action of the board by summarily dismissing its members and to support the Attorney General with all of the means in his power in defeating the Rayville compromise and compelling a trial of the case in the courts?"

Defendants filed exceptions of no cause of action, which were sustained; and plaintiff has appealed.

Newell on Slander and Libel, pp. 270, 271, divides defamatory words into five classes, as follows:

"(1) Words obviously defamatory.

"(2) Words ambiguous, which, though apparently defamatory, are still on their face susceptible of an innocent meaning.

"(3) Words meaningless until some explanation is given; slang expressions; foreign languages; words used in some special, technical, or customary sense.

"(4) Words apparently innocent, but capable of a defamatory meaning ironically spoken.

"(5) Words obviously innocent and capable of a defamatory meaning."

[1] Plaintiff does not allege that the words of the two exhibits attached to his petition are obviously defamatory, or are ambiguous, or are meaningless; but that they are defamatory in meaning and intention, and that they are false.

He says that the defendants, in Exhibit A, meant to charge and did charge that petitioner was a party to a deal in public lands, which defendants term a fraudulent deal; but plaintiff does not point to any portion of the exhibit charging that he was a party to such deal, or where he, a state senator, in furtherance of such deal, had introduced a bill in the Legislature as a part of said deal, or that he connived, aided, participated in, or approved of the paying out of a fund to bribe the members of the Tensas levee board, or that he, as district judge, had rendered a judgment in pursuance of his approval or connivance, aid, and participation in the corrupt transaction just above referred to; or that he, as Governor of the state, made appointments to the new levee board with the end in view that the new board might consummate such corrupt transaction by compromising the suit for its annulment; or for the recovery of the lands.

The court fails to find in the exhibits the

inferences set out by plaintiff in his petition.

The Exhibit A chronicles the events connected with the Tensas land scandal, which has occupied the attention of the public, the Legislature, the executive department, and the courts of the state for several years past. And while plaintiff's name has been and is connected with some of these events in his several official capacities as state senator, judge, and Governor, there is no word found in the article, or in Exhibit B, which charges him directly or indirectly with knowledge of, or approval of, or participation in, any of these things. On the contrary, the articles disclaim any such knowledge or belief by defendants.

[3] The articles declare a great interest on the part of defendants in a great public matter, and there is given in the newspaper, defendant, a history of that matter. Defendants inform the public and the chief executive of the state of the events connected with this public matter, and they call upon the chief executive to follow a suggested line of conduct to save to the state the public lands involved.

There is no intimation in the exhibits that plaintiff has done or will do anything which a man of integrity, or an official in the honest discharge of his duties, would do.

There are the words and warnings of interested citizens of the state addressed to the chief executive in these articles. The right to address public officials on public matters, or to criticize them, in respectful language, is reserved to every citizen and to the press. Such communications are privileged. Hamilton v. Eno, 81 N. Y. 116; Black's Constitutional Law, §§ 553, 554.

The closing paragraph of Exhibit B fully describes the attitude of the defendants towards the whole matter and towards the plaintiff, and that is not unfriendly towards or defamatory of plaintiff.

As the articles in question contain no defamatory words, or words capable of a defamatory meaning, towards plaintiff, the exception of no cause of action was properly sustained by the district court.

In a supplemental brief, just filed by plaintiff, it is said:

"The best argument that can be made by defendants is that they did no more than raise a suspicion of the plaintiff's integrity in connection with the reprobated transaction. What is it but the worst kind of a libel to subject a man to such suspicion?"

The defendants have made no such admission in the plea they have filed, and there is no suggestion in the publications complained of that plaintiff had been suspected by defendants or any one else that plaintiff was connected with the reprobated transaction referred to in the publications. If plaintiff suspects defendants with having charged him with connection with the reprobated transaction he fails to point to any word or clause upon which his suspicion is founded. And such word or clause is not to be found in the published articles.

Again, it is argued in the brief:

"It is not necessary in alleging malice to set out the facts which it is intended to prove as establishing malice. The allegations in the instant case are clear, explicit and direct that the defendants were actuated by malice in the publications referred to. Moreover, there is the direct charge and allegation in the petition that the articles were 'published' for the purpose of causing it to be believed that petitioner was himself devoid of integrity notwithstanding the knowledge on the part of the proprietor and manager of said newspaper that said charges were without any foundation whatever in fact.

"Clearly, if that allegation be true—and it must be so considered and treated for the purpose of the exception—the petition alleges a cause of action."

[2] It has been held that it is not necessary to allege malice in a civil prosecution for libel. Plaintiff alleges that the publications are "false, malicious, untrue, and libelous," but if his petition does not really allege a libel of himself by the defendants he cannot prove that the alleged libel was maliciously published. He must first show that a

libel has been published to sustain his cause of action against defendants. If the publications complained of are not libelous, then it is immaterial whether defendants bear malice against plaintiff or not. The suit is for damages for libel, and not for malice. Malice or malicious feelings on the part of defendants towards plaintiff is not the cause of action upon which the suit is based; and in disposing of the exception of no cause of action to the suit for libel it is not necessary to consider the allegation of malice at all, if there is no libel.

Plaintiff alleges that the publications were—

"for the purpose of causing it to be believed that plaintiff himself was devoid of integrity, notwithstanding the knowledge on the part of the proprietor and manager of said newspaper that said charges were without any foundation in fact."

That is a conclusion on the part of plaintiff, which is not sustained by the articles alleged to be libelous, and which are attached to and made parts of the petition. It is to these published articles, made parts of plaintiff's petition, to which the court must turn to determine whether they are libelous or not; and if they do not cause the ordinary mind to believe that plaintiff is therein charged to be devoid of integrity, then they are not libelous, and the exception of no cause of action should be sustained.

The reasons for judgment of the district judge are found in the record, and they are made the basis of the opinion of the court. They are as follows:

"The Governor of Louisiana has sued the Daily States newspaper for libel, basing his cause of action on two publications, which are annexed to and made part of the petition, marked Exhibits A and B. The petition interprets the publications as charging that the Governor was a party to certain deals in public lands, and that he gave his aid and countenance to the nefarious actions of those who set the same on foot and who consummated the same, and under this interpretation it is alleged that the said publication is untrue and is malicious and libelous, and written for the purpose of attacking the petitioner's integrity.

"Two exceptions are urged: The first a prayer for oyer of other articles of similar tenor to which the petition makes reference in the beginning of paragraph IV—if the said articles are intended to be relied on—and the second that the petition sets forth no cause of action. As to the first exception, plaintiff has made no effort to amend, on the assumption, perhaps, that the nature of the articles is sufficiently indicated in Exhibit B, because in the conclusion of paragraph IV they are said to be of like tenor or import; from this point of view, the argument on the exception of no cause of action is applicable to the whole petition.

"The fact that the libels are annexed to petition, as part of the same, and that the petition charges that the publisher 'meant in said Exhibit A to charge and did charge' that petitioner was party to a deal, etc., makes the case an ideal one for the application of the exception of no cause of action, because it is palpable that if the reading of that exhibit does not substantiate the allegation, then the charge of libel falls. The same may be said of Exhibit B, to which the petition adds an additional interpretation 'because (says the pleader) it sets forth and infers that petitioner was so compromised by his alleged connection with the history of the so-called land deal as to make it necessary for the preservation of his honor to take the course indicated and described by said newspaper,' etc.

"It is the universal rule that: 'The official act of a public functionary may be freely criticized, and entire freedom of expression used in argument, sarcasm and ridicule upon the act itself; and that then the occasion will excuse everything but actual malice and evil purpose in the critic; * * * the occasion will not of itself excuse an aspersive attack upon the character and motives of the officer; and that to be excused, the critic must show the truth of what he has uttered of that kind.' Hamilton v. Eno, 81 N. Y. 116.

"The rule is stated by Black, Constitutional Law (2d Ed.) 553, 554, as follows: 'In the class of conditionally privileged communications are included criticisms upon the official character or conduct of a public officer. Such criticisms are not actionable if made with an honest design to enlighten the public and for their interest and benefit, but they are punishable if made with a malicious design to injure or degrade the individual.' 'Further, in applying the rule of fair and reasonable comment upon the public conduct of an officer, the courts will not be illiberal in measuring the degree of warmth and vigor which the writer may infuse into his language.'

"Other authorities might be cited, if needed, such as Commonwealth v. Blanding, 3 Pick. (Mass.) 304, 15 Am. Dec. 220, approved in Fitzpatrick v. Daily States Pub. Co., 48 La. Ann. 1116 [20 South. 173].

"Following these principles, and reading by their light the Exhibits A and B, can it be said that either of the publications is susceptible to

the interpretation placed on it by the petitioner? The first exhibit is merely a chronological statement or history of the events in the Tensas land deal; the petition does not dispute the correctness of the facts as related, but draws an inference therefrom which the court cannot draw. If one reading the publication cannot find the charge which petitioner says is charged therein, even this branch of the action fails, because it is what appears in or can be inferred from that article which is the cause of complaint.

"The second exhibit is an editorial which besides the complaint above recited is additionally complained of because it describes the Governor 'as deprived of his gubernatorial discretion by reason of the circumstances set forth in said newspaper.' Almost any other reader of the article would draw a contrary impression. The close of the article is in accord with the tone of the whole:

" 'We have said that the unfortunate association of his name so frequently with this unholy transaction does not of itself involve the Governor in either moral or legal turpitude. But can there be any question that, for his own sake and for the honor of the state, it leaves the Governor no alternative but to repudiate the action of the board by summarily dismissing its members and to support the Attorney General with all the means in his power in defeating the Rayville compromise and compelling a trial of the case in the courts?'

"It is clear that this editorial falls within that class of criticism of an official which is regarded everywhere as being within the right of the citizen and of the press, and it cannot be judicially condemned without overthrowing that privilege.

"A cold self-possession, a complete tranquillity are out of place in matters of such grave import; the language of the free and equal does not have to be couched in the speech of the courtier.

"Under our practice, where the whole case is developed by the petition and the documents attached thereto, the facts as recited or alleged are looked at to judge whether the conclusions of fact drawn by the pleader are within the scope of the facts recited. The court is to say whether the facts charged are a legal foundation for the conclusions of fact drawn therefrom. Following this rule the inferences or interpretations placed on the exhibits must be drawn from these exhibits or there is no case; this is peculiarly so here, where the pleader points to the exhibit itself as showing its meaning to be what he says it means. It is perfectly clear that up to this point in the history of the case the exhibits are the case, and if they do not support the charge and show a cause of action, then the exception is good.

"The case of Dr. Martin v. The Picayune, 115 La. 983 [40 South. 376, 4 L. R. A. (N. S.) 861], quoted by plaintiff is an illustration. It shows that there must be a cause of action stated; in that case it was that the printed article praising the surgeon had the effect of placing the petitioner in the category of 'quacks'; that that was the ad damnum clause which saved the petition.

"In what part of the plaintiff's petition in this case can you find the similar and necessary allegations of fact outside of the libel itself?

"The fact that the petitioner further charges that the publication was made with malice does not affect the situation. If the criticism and comment are in the words and character within the rule of privilege, that is, if it is not aspersive or defamatory, it is not actionable. The damages are claimed as 'punitive' damages; the defendant is to be punished for 'maliciously' publishing something which is not on its face or on its inference false or libelous. It matters not whether the claim is for actual or punitive damages. The general doctrine in Louisiana is correctly stated in Covington v. Robertson, 111 La. 341, 342 [35 South. 586, 593], as follows:

" ' "The better view, undoubtedly, is that, except in the case of communications or publications which are qualifiedly privileged, malice on the part of the defendant in uttering or publishing the defamatory words is not necessary to entitle the plaintiff to recover in a civil action all the actual damages which he has sustained by reason of the libel or slander, but may be shown to entitle the plaintiff to recover punitive or exemplary damages." The law in Louisiana is that every act of man which occasions injury or damage to another obliges him by whose fault it has been caused to repair it. C. C. art. 2315. All that is necessary here for a party demanding such damages from another is to allege a condition of things as would show a "fault" on the part of the defendant, resulting in damages and injury to himself therefrom, and on the trial of his case to establish the truth of his allegations. Plaintiff may recover compensatory damages, regardless of whether there was any actual malice or not. The question of actual malice only arises when punitive damages are claimed.'

"In oral argument it was contended that the pleader's inferences are matters he should be allowed to go to the jury to prove, but how can an inference be a fact, when you point to the thing which you say is the inference and the thing thus pointed to does not bear out the charge?

"The charge of malice in the publication is overwhelmed by the larger proposition that the thing complained of does not authorize the suit at all—the general doctrine in the cases relied on by the plaintiff has no application to the case of a public official; in that case the preliminary question lying across his path is the character of the act itself. If on its face and with all of its inferences it does not bear out the charge of libel, it cannot be punished.

"For these reasons the exceptions are maintained, and plaintiff's suit is dismissed."

Affirmed.

See dissenting opinions of PROVOSTY and O'NIELL, JJ., 74 South. 197.