408 So.2d 1126 (1981)
Gerard B. WATTIGNY, Plaintiff-Appellee,
v.
William H. LAMBERT, Defendant-Appellant.
No. 8345.
Court of Appeal of Louisiana, Third Circuit.
September 11, 1981.
Rehearing Denied October 26, 1981.
Writ Denied December 14, 1981.
*1127 Allen, Gooch & Bourgeois, Frank A. Flynn, Lafayette, for defendant-appellant.
Armentor & Wattigny, Gerard B. Wattigny, New Iberia, for plaintiff-appellee.
Before FORET, SWIFT and DOUCET, JJ.
FORET, Judge.
Gerard B. Wattigny (appellee) brought this defamation action and, in the alternative, action for malicious prosecution. Appellee seeks to recover damages for injuries he sustained as a result of the appearance of certain defamatory allegations in a petition prepared by the defendant, William H. Lambert (appellant). The petition was filed by one of appellant's clients, William Jamall Jacob, Jr.
The trial court rendered judgment in favor of appellee at the trial on the merits. Appellant was granted a suspensive appeal from that judgment and presents the following issues:
(1) Whether the allegations of the judicial pleading, on which this defamation action is based, are protected by the First Amendment to the U.S. *1128 Constitution and/or LSA-Const., Article 1, § 7;
(2) Whether appellant did in fact defame appellee, either intentionally or negligently, and thus, should be held liable to the appellee for the injuries resulting therefrom; and
(3) Whether appellant may claim the benefit of an absolute privilege, or, in the alternative, a qualified privilege to absolve himself from liability, if found liable to appellee.
Appellee has answered the appeal and presents the following issues:
(1) Whether the trial court's award of $5,000.00 in damages to appellee is inadequate and an abuse of that court's "much discretion";
(2) Whether the trial court erroneously considered appellant's ability to pay a judgment in fixing the amount of its award.

FACTS
Appellant and appellee are both practicing attorneys in the State of Louisiana. Appellee instituted this action on February 2, 1978, alleging that appellant had prepared certain pleadings, on behalf of one of his clients, which contained allegations directed toward him that were defamatory. In the alternative, appellee alleged that appellant commenced and continued certain proceedings against him, without probable cause and with malice. Thus, appellee also sought to assert a cause of action in malicious prosecution.
The allegations, alleged to be defamatory by appellee, were contained in a petition prepared by the appellant on behalf of William Jamall Jacob, Jr. (Jacob, Jr.). Appellant gave that petition to Jacob, Jr. with instructions to file it with the Clerk of Court's Office in Iberia Parish, which he did on March 1, 1976. The filing of that petition instituted the action of William Jamall Jacob, et al v. William (Willie) Jacob, et al, Docket Number 37,098, Sixteenth Judicial District Court, Parish of Iberia, Louisiana. Essentially, it was alleged in that petition that appellee had conspired with certain deputies employed by the Iberia Parish Sheriff's Department and with the father and a brother of Jacob, Jr. to have Jacob, Jr. and his purported wife, Joyce Burns Jacob (Joyce), illegally arrested and wrongfully imprisoned in the Iberia Parish jail. It was further alleged in the petition that Jacob, Jr. and Joyce were wrongfully imprisoned and detained in said jail at an exorbitant bail figure, set and obtained at the instance of appellee, among others.
The above mentioned proceeding was terminated in favor of appellee when the trial court granted appellee's motion for summary judgment and dismissed the action of the petitioners therein with prejudice on November 8, 1977. No appeal was taken from that judgment. Appellant filed a motion to withdraw as counsel of record for those petitioners on February 17, 1978, approximately two weeks after appellee instituted this defamation action against him. However, appellant alleged in his motion that his representation had terminated on October 14, 1977.
A trial on the merits was held on appellee's action and the trial court took the case under advisement. The trial court then rendered judgment in favor of appellee and against appellant, awarding appellee $5,000.00 in damages. Appellant was granted a suspensive appeal from that judgment.

CONSTITUTIONAL PROTECTIONS
Appellant contends that statements or allegations set forth in judicial pleadings prepared by an attorney acting in good faith and based on the representations of his client are protected by the First Amendment to the U.S. Constitution and LSA-Const., Article 1, § 7. Appellant argues that this protection extends to statements or allegations which are defamatory. We disagree.
Appellant cites the decision of the U.S. Supreme Court in New York Times v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed. 686 (1964) in support of his contention. The U.S. Supreme Court, in New York Times v. *1129 Sullivan, supra, noted that it was required in that case, "... to determine for the first time the extent to which the constitutional protections for speech and press limit a State's power to award damages in a libel action brought by a public official against critics of his official conduct." See 376 U.S., at 256, 84 S.Ct., at 713. New York Times, supra, then went on to set the constitutional standard for cases of this type and stated that, "The constitutional guarantees require, we think, a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with `actual malice'that is, with knowledge that it was false or with reckless disregard of whether it was false or not." See 376 U.S., at 279, 280, 84 S.Ct., at 725, 726.
We find New York Times, supra, to be clearly inapposite to the issues before us for the following reasons: First, New York Times, supra, was an action brought by a "public official", rather than by a private individual such as appellee. Second, one of the defendants in New York Times, supra, was a member of the news media, rather than a private individual such as appellant. Finally, the allegedly defamatory statements upon which the action in New York Times, supra, was based were directed towards the official conduct of a public official rather than the conduct of a private individual.
The next case cited by appellant in support of his contention is the decision of the U.S. Supreme Court in Gertz v. Robert Welch, Inc., 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed. 789 (1974). The principal issue in Gertz was "... whether a newspaper or broadcaster that publishes defamatory falsehoods about an individual who is neither a public official nor a public figure may claim a constitutional privilege against liability for the injury inflicted by those statements." See 418 U.S., at 332, 94 S.Ct., at 3003. Gertz found that plaintiff therein was neither a public official nor a public figure and rejected defendant's argument that the "New York Times" standard was applicable to that action. In rejecting that argument, Gertz stated that, "... we conclude that the state interest in compensating injury to the reputation of private individuals requires that a different rule should obtain with respect to them." See 418 U.S., at 343, 94 S.Ct., at 3008.
Gertz gave the following reasons for its decision. First, public officials and public figures usually enjoy a significantly greater access to the channels of effective communication and hence have a more realistic opportunity to counteract false statements than private individuals normally enjoy. Therefore, private individuals are more vulnerable to injury and the state interest in protecting them is correspondingly greater. Second, a public official or public figure must accept certain necessary consequences of their involvement in public affairs, and they run the risk of closer public scrutiny than might otherwise be the case. Third, the communications media are entitled to act on the assumption that public officials and public figures have voluntarily exposed themselves to an increased risk of injury from defamatory falsehood concerning them. Finally, a private individual has relinquished no part of his interest in the protection of his own good name and has a more compelling call on the courts for redress of injury inflicted by defamatory falsehood.
It was for these reasons that Gertz concluded that, "... the States should retain substantial latitude in their efforts to enforce a legal remedy for defamatory falsehood injurious to the reputation of a private individual." See 418 U.S., at 345, 346, 94 S.Ct., at 3009, 3010. Gertz held that in cases involving actions brought by private individuals to recover damages for injuries resulting from defamatory falsehoods, the constitutional standard was that, "... so long as they do not impose liability without fault, the States may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual." See 418 U.S., at 347, 94 S.Ct., at 3010. (Emphasis provided.)
*1130 The Louisiana Supreme Court, in Mashburn v. Collin, 355 So.2d 879 (La.1977), had before it a defamation action brought by the owner of a restaurant against the author of a newspaper column. Plaintiff in Mashburn sought to recover damages for humiliation, injury to professional reputation and loss of business allegedly caused by the publication in the column of an article derogatory of the restaurant's food. Mashburn stated, on page 885:
"We conclude, therefore, that the First Amendment freedoms as defined by the New York Times-Gertz series of decisions afford, at the very least, a defense against defamation actions for expressions of opinion about matters of public concern made without knowing or reckless falsity. Thus the Supreme Court appears to have drawn an important distinction between statements of fact and expressions of opinion in molding the constitutional privilege. While the states are free to impose liability for misstatements of fact about private individuals made with fault, they may impose liability for expressions of defamatory opinions about matters of public concern only when made with knowing or reckless falsity. The contours of the New York Times-Gertz privilege regarding expressions of opinion are uncertain but we think that it clearly protects at least (1) mere expressions of opinion; (2) by members of the press or the news media;32 (3) concerning matters of public interest or concern; (4) when made without knowing or reckless falsity." (Emphasis ours.)
The defamatory statements directed towards appellee in the action before us can only be characterized as misstatements of fact. They accused the appellee and others of committing certain crimes and the evidence clearly shows that these statements were false.
Mashburn stated, on page 891:
"In order to avoid confusion in this evolving area of law, it is desirable that we state clearly some of the issues which have not been decided. Since the Supreme Court decisions from New York Times through Gertz and [Time, Inc. v.] Firestone [424 U.S. 448, 96 S.Ct. 958, 47 L.Ed.2d 154] establish only minimum safeguards for the freedom of speech and the freedom of press under the First Amendment, it is permissible and perhaps appropriate for a state to grant broader protection of these important rights under its own constitution or laws. Because an expression of opinion without knowing or reckless falsity about a matter of public concern by the press is fully protected under the First Amendment aegis, we did not consider to what extent our state constitution, jurisprudence and statutes also protect expression of such opinions. Nor did we attempt to define the ambit of Louisiana's safeguard for defamatory misstatements of fact. Since the decision in Gertz many states have applied its negligence standard of liability in defamation actions based on misstatements of fact brought by private persons,59 while some have followed the Rosenbloom rationale, applying an actual malice or gross negligence standard of liability in actions based on defamatory misstatements of fact brought by private individuals involved in matters of general or public interest.60 It is clear that a state is free to adopt any reasonable standard, so long as it affords the minimum protection required by the New York Times-Gertz cases.61" (Emphasis ours.)
The defamatory falsehoods giving rise to the present action can in no way be considered as matters of public interest or concern and this action can be distinguished on its facts from the defamation action in Gertz, in that the defendant in Gertz was a member of the news media, rather than a private individual. Thus, an argument could be made that Gertz is inapplicable to the present defamation action and that less constitutional protection is accorded a defendant who defames another under the circumstances present here.[1] However, we reject such an argument.
*1131 We hold that, in defamation actions such as this, the defendant is entitled to the constitutional protections set forth in Gertz, i.e., he will be held liable only if a finding of fault is made.
Appellant's next contention is that statements or allegations set forth in judicial pleadings prepared by an attorney acting in good faith and based on the representations of his client are protected by LSA-Const., Art. 1, § 7. Appellant again argues that this protection extends to statements or allegations which are defamatory. We disagree. LSA-Const., Art. 1, § 7 provides that:
"§ 7. Freedom of Expression
Section 7. No law shall curtail or restrain the freedom of speech or of the press. Every person may speak, write, and publish his sentiments on any subject, but is responsible for abuse of that freedom." (Emphasis provided.)
This article specifically provides that every person is responsible for his abuse of the freedoms enumerated therein. We find that a person who defames another has abused the freedoms set forth in LSA-Const., Art. 1, § 7. We further find that under the facts and circumstances of the defamation action before us, LSA-Const., Art. 1, § 7 provides appellant with no greater protection than does the First Amendment to the U.S. Constitution.

LOUISIANA DEFAMATION LAW
The threshold issue in a defamation action is whether the complained of words are defamatory, i.e., capable of a defamatory meaning. Carter v. Catfish Cabin, 316 So.2d 517 (La.App. 2 Cir. 1975); Brown v. News-World Publishing Corporation, 245 So.2d 430 (La.App. 2 Cir. 1971).
Brown v. News-World Publishing Corporation, supra, defined a defamatory statement on page 432 as:
"A statement is defamatory when it tends to expose a person to contempt, hatred, ridicule or obloquy; or which causes a person to be shunned or avoided; or which has a tendency to deprive him of the benefits of public confidence or injure him in his occupation; and includes almost any language which upon its face has a natural tendency to injure the person's reputation, either generally or with respect to his occupation. The intent and meaning of an alleged defamatory statement must be gathered not only from the words singled out as libelous but from the context as well, and the true meaning must be ascertained from a consideration of all parts of the statement as well as the circumstances of its publication. The test is the effect the article is fairly calculated to produce and the impression it would naturally engender in the minds of the average persons among whom it is intended to circulate."
The evidence shows that appellant prepared a "PETITION FOR DAMAGES FOR ILLEGAL ARREST AND WRONGFUL IMPRISONMENT WITH TRIAL BY JURY". As noted above, appellant then gave that pleading to Jacob, Jr. on March 1, 1976, to file with the Iberia Parish Clerk of *1132 Court's Office, which he did. The filing of that petition instituted the action of William Jamall Jacob, et al v. William (Willie) Jacob, et al, supra. Appellee was named as one of the defendants to that action and contends that both the styling of the petition, reproduced above, and the allegations of Paragraphs 3 and 4 therein are defamatory of him.
Paragraph 3 of the petition reads:

3.
"On or about February 28, 1975, defendants, WILLIAM (WILLIE) JACOB, THOMAS (TOM) JACOB, and GERARD B. WATTIGNY, in concert by plan, intention and design did cause petitioners to be illegally arrested and wrongfully imprisoned in the Iberia Parish Jail."
Paragraph 4 of the petition reads:

4.
"Petitioners were wrongfully imprisoned and detained in said jail at an exorbitant bail figure, set and obtained at the instance of defendants, until Monday, March 3, 1975."
The allegations of Paragraph 3 accused the appellee and others of committing the tort of "false imprisonment". The Louisiana Supreme Court, in Kyle v. City of New Orleans, 353 So.2d 969 (La.1977), summarized the earlier jurisprudence concerning the tort of "false imprisonment" and stated on page 971 that, "False arrest and imprisonment occur when one arrests and restrains another against his will without a warrant or other statutory authority. Simply stated, it is restraint without color of legal authority." However, and much more serious, the allegations of paragraph 3 accused the appellee of conspiring with others to commit a crime and of actually committing that crime. See LSA-R.S. 14:26[2] and LSA-R.S. 14:46.[3]
As noted above, our review of the evidence clearly shows that both allegations are false. This Court has no trouble finding that the allegations of paragraph 3 are defamatory. Certainly, accusations of having conspired to commit a crime and having committed that crime have a tendency to expose the accused to contempt, hatred, ridicule, etc. This Court also has no trouble finding that the allegations of paragraph 4 are defamatory. It accused the appellee of subverting the criminal justice system, an accusation particularly injurious to an attorney with respect to his occupation.
Appellant correctly contends that the Louisiana courts do not make the technical distinction found in the common law as to words "actionable per se" and those that are not. See Miller v. Holstein, 16 La. 389 (La.1840) and on rehearing, 16 La. 395 (La. 1840); Spotorno v. Fourichon, 40 La.Ann. 423, 4 So. 71 (1888); Martin v. The Picayune, 115 La. 979, 40 So. 376 (1906); Makofsky v. Cunningham, 576 F.2d 1223 (U.S.Ct. of App., 5th Cir., 1978), Footnote 22. We note particularly the words of Justice Bullard in Miller, supra, in delivering the opinion of the Court on rehearing at page 404:
"None of us suppose that we are bound by the technical and artificial rules of the common law of slander, but when our law is silent, it is supposed that we may resort to a foreign system for a rule, if that rule be consonant to reason and equity. I am by no means prepared to adopt from the common law the distinction between words which are actionable in themselves, and words which are not; and to say that a plaintiff is not entitled to recover in an *1133 action of slander, unless charged with an indictable offence without proof of special damages."
Appellant then contends that a logical extension of the refusal to make that distinction is that the Louisiana courts should also refuse to make a distinction between words that are "defamatory per se" and those that are not. Thus, appellant argues that the trial court erred in applying the principle of "defamation per se", and the consequences that follow that application, in finding him liable to the appellee.
There is a distinction between the concepts of words "actionable per se" and those that are "defamatory per se". "Actionable per se" is a term of the common law meaning that an action based on the utterance of such words may be brought without any proof of special damage. On the other hand, the concept of "defamation per se" signifies those words that are by their very nature defamatory, i.e., words that impute the commission of the crime to another, or that one is afflicted with a loathsome disease, etc. It is unnecessary to examine the extrinsic facts surrounding the utterance of words which are "defamatory per se" to determine whether they are indeed defamatory. See Prosser: Law of Torts, 4th Ed., § 112, pg. 763. See also Makofsky v. Cunningham, supra, Footnote 23.
Apparently the Louisiana courts have made the distinction between words "defamatory per se" and those that are not ever since the Louisiana Supreme Court made that distinction in Madison v. Bolton, 234 La. 997, 102 So.2d 433 (La.1958). A review of that opinion shows that the Court derived the distinction from common law sources and that it mistakenly termed the distinction as being one between words "actionable per se" and those that are not. See Makofsky v. Cunningham, supra, Footnote 23.
The Louisiana Supreme Court has recognized that distinction in the recent case of Cangelosi v. Schwegmann Brothers Giant Super Markets, 390 So.2d 196 (La.1980), when it approvingly cited Trahan v. Ritterman, 368 So.2d 181 (La.App. 1 Cir. 1979), for the proposition that words which impute a crime to another are "defamatory per se". Trahan v. Ritterman, supra, found that the trial court properly held that when allegedly defamatory words are found to be "defamatory per se", falsity and malice are presumed and defendant bears the burden of rebutting the presumption.
We tend to agree with appellant that, under Louisiana law, there is no need to resort to the common law distinction between words "defamatory per se" and those that are not. However, for obvious reasons, we cannot ignore the jurisprudence that utilizes that distinction.
In Louisiana, defamation is a quasi offense and, as such, is governed by LSA-C.C. Article 2315. Miller v. Holstein, supra, and on rehearing, supra; Spotorno v. Fourichon, supra; Acme Stores v. Better Business Bureau of Baton Rouge, 225 La. 824, 74 So.2d 43 (La.1954); Wilson v. Capital City Press, 315 So.2d 393 (La.App. 3 Cir. 1975), writ denied, 320 So.2d 203 (La.1975); Fontenot v. Fontenot, 235 La. 488, 104 So.2d 431 (La.1958); Madison v. Bolton, supra.
LSA-C.C. Article 2315 provides, in pertinent part:
"Art. 2315. Liability for acts causing damage; survival of action
Art. 2315. Every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it."
Under this article, the elements of a cause of action are fault, causation, and damage. Weiland v. King, 281 So.2d 688 (La.1973); Eschete v. City of New Orleans, 258 La. 134, 245 So.2d 383 (1971). Thus, LSA-C.C. Article 2315, supra, accords appellant the constitutional protection to which he is entitled under Gertz, supra, as appellee must prove fault on his part to successfully maintain this defamation action.
12 La. Civil Law Treatise: Tort Doctrine; Stone, F.F.; § 176, states:
"§ 176. c. Basis of Liability

Civil liability for defamation in Louisiana is founded upon a violation of the *1134 general tort articles 2315 and 2316 requiring proof of fault and damage.36 It differs from criminal liability for defamation in that the latter is largely influenced by the Anglo-American common law, while the roots of civil liability are traced to French, Spanish and Roman sources. The coexistence of these two "defamations" in Louisiana has produced some confusion,37 but by and large courts have refused to receive arguments based on common law distinctions. Thus the distinctions drawn at common law between slander and libel and between words actionable per se and those actionable only on proof of special damage have no place in Louisiana, where the wrong is defamation however accomplished.38" (Emphasis ours.)
We hold that the essential elements of a cause of action in defamation, identical in circumstances to the one before us, are the same as those for any other offense or quasi offense arising under the provisions of LSA-C.C. Article 2315 or LSA-C.C. Article 2316, i.e., fault, causation, and damage.

APPELLANT'S LIABILITY
We have found the allegations contained in the petition prepared by appellant to be defamatory. We turn now to a determination of whether appellant should be held liable for the injuries suffered by appellee as a result of the publication of those defamatory statements. Appellant contends that he should not be held liable because he was justified in relying on the representations made to him by Jacob, Jr. in preparing that pleading.
The Louisiana Supreme Court, in Covington v. Roberson, 111 La. 326, 35 So. 586 (1903), stated, on page 593, that:
"The better view, undoubtedly, is that, except in the case of communications or publications which are qualifiedly privileged, malice on the part of the defendant in uttering or publishing the defamatory words is not necessary to entitle the plaintiff to recover in a civil action all the actual damages which he has sustained by reason of the libel or slander, but may be shown to entitle the plaintiff to recover punitive or exemplary damages." The law in Louisiana is that every act of man which occasions injury or damage to another obliges him by whose fault it has been caused to repair it. Civ.Code, art. 2315. All that is necessary here for a party demanding such damages from another is to allege a condition of things such as would show a "fault" on the part of the defendant, resulting in damages and injury to himself thereform, and on the trial of his case to establish the truth of his allegations. Plaintiff may recover compensatory damages, regardless of whether there was any actual malice or not. The question of actual malice only arises when punitive damages are claimed." (Emphasis ours.)
See also Hall v. Ewing, 140 La. 907, 74 So. 190 (1917); Barnhill v. Times-Picayune Publishing Company, 171 La. 286, 131 So. 21 (1930); Warner v. Clark, 45 La.Ann. 863, 13 So. 203 (1893).
12 La. Civil Law Treatise: Tort Doctrine; Stone, F.F.; § 181, provides the following on the concept of fault in defamation actions in Louisiana:
"§ 181. v. Fault
Although at Roman law the delict of iniuria required intention to insult as a necessary element, in Louisiana where action is based on articles 2315 and 2316, a defendant may be held liable either on the basis of intention or negligence. Though some of the early cases speak of a requirement of malice, express or implied,60 such is not a requirement under articles 2315 and 2316. The presence of malice may be taken into consideration by the court in the award of damages.61 Malice may destroy an otherwise valid privilege. Malice may destroy the defense of "fair comment".62 The absence of malice may be taken into consideration in the amount of damages awarded.63" (Emphasis ours.)
There was no evidence presented at the trial of this action which indicated that appellant wilfully and intentionally defamed appellee. The trial court found this *1135 to be so and our review of the record establishes that such a finding is not clearly wrong. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978); Canter v. Koehring Company, 283 So.2d 716 (La.1973). Therefore, if appellant is to be held liable for the injuries suffered by appellee, it must be on the basis that he negligently published the defamatory statements.
Appellee contends that appellant defamed him by preparing the petition containing the defamatory allegations without probable cause and by giving it to his client. We construe appellee's contention to be that appellant's conduct amounted to negligence, in that he prepared and published the petition without making an investigation of his client's accusations as a reasonable, prudent attorney should have done. Appellee contends that the defamatory allegations were picked up by the news media after the filing of the petition and were spread throughout the area where he practices his profession. Appellee alleges that he suffered the following injuries as a result of such publication:
Damage to personal and professional reputation;
Mortification, humiliation, and embarrassment;
Mental pain and anguish.
The liability of the appellant, if any, must be predicated on the concept of "fault" under LSA-C.C. Articles 2315 and/or 2316. The first inquiry in making a determination of liability is whether any causal relationship exists between the harm to the appellee and the appellant's alleged negligent conduct. Thus, if appellee can show that he probably would not have suffered the injuries complained of but for appellant's conduct, he has carried his burden of proof relative to cause-in-fact. Vidrine v. Missouri Farm Association, 339 So.2d 877 (La.App. 3 Cir. 1976), writ denied, 342 So.2d 216 (La.1977); Stewart v. Gibson Products Company of Natchitoches Parish Louisiana, Inc., 300 So.2d 870 (La.App. 3 Cir. 1974); Hill v. Lundin & Associates, Inc., 260 La. 542, 256 So.2d 620 (1972); Shelton v. Aetna Casualty and Surety Company, 334 So.2d 406 (La.1976).
There can be no doubt that appellee would not have suffered the injuries complained of but for appellant's preparation of the petition containing the defamatory statements and his transfer of that petition to his client. Thus, we find that appellee has carried his burden of proof relative to cause-in-fact.
A finding that appellant's conduct was a cause-in-fact of appellee's injuries, however, does not establish liability. In addition, we are required to ascertain whether the appellant breached a legal duty imposed to protect against the particular risk involved. Shelton v. Aetna Casualty and Surety Company, supra; Smolinski v. Taulli, 276 So.2d 286 (La.1973); Hill v. Lundin & Associates, Inc., supra. In making this determination, the following inquiries must be made: (1) What, if any, duty was owed by the appellant to the appellee? (2) Was there a breach of this duty? (3) Was the risk and harm caused within the scope of protection afforded by the duty breached? Shelton v. Aetna Casualty and Surety Company, supra; Hill v. Lundin & Associates, Inc., supra; Thomas v. Hanover Insurance Company, 321 So.2d 30 (La.App. 3 Cir. 1975).
The first determination to be made is whether appellant, as an attorney, owed any duty to the appellee with respect to the publication of defamatory statements in a judicial pleading. We have used all or part of the following provisions of the Code of Professional Responsibility[4] to aid in our determination of this difficult question. The provisions utilized are Ethical Consideration 2-30; Disciplinary Rule 2-109; Ethical Consideration 7-4; Ethical Consideration 7-10; Ethical Consideration 7-22; and Disciplinary Rule 7-102.[5] We want to make it clear that our use of these provisions in no way constitutes a finding by this *1136 Court that appellant violated any or all of them.
An attorney has a duty to make a reasonable investigation of the information given him by a client, when such information, if false, would be clearly defamatory if published in a judicial pleading. Appellant owed this duty to appellee.
Our next inquiry is whether appellant breached this duty. Appellant testified that Jacob, Jr. came to his office on Thursday, February 26, 1976, and sought to engage his services as an attorney. He stated that Jacob, Jr. felt that both he and Joyce had a claim against appellee and others for certain allegedly illegal actions that had been taken against them. Specifically, Jacob, Jr. referred to their arrest on February 28, 1975 on charges of violating LSA-R.S. 14:63.3[6] and their detention in the Iberia Parish jail until March 1, 1975 when both were released on their own recognizance under bonds of $5,000.00 each.
*1137 Appellant testified that Jacob, Jr. told him that appellee had conspired with others to have him and his wife arrested and held under an exorbitant bond. These "other" persons included William (Willie) Jacob, Sr. (Jacob, Sr.), the father of Jacob, Jr. and Thomas Jacob, a brother of Jacob, Jr. and certain unnamed deputies employed by the Iberia Parish Sheriff's Department. There had been a number of lawsuits filed by Jacob, Jr. against his father and brother and vice versa. Appellee had represented Jacob, Sr. and Thomas Jacob in these civil proceedings. Appellee is the son of Gerard H. Wattigny, who was the Sheriff of Iberia Parish at all relevant times. Appellant testified that Jacob, Jr. told him that appellee had used his "influence" with the Iberia Parish Sheriff's Department to take the alleged illegal action against him and Joyce.
Appellant testified that he had to act expeditiously as Jacob, Jr.'s claim had to be filed on or before Monday, March 1, 1976, because of prescription. Appellant traveled to the Iberia Parish Clerk of Court's Office after talking with Jacob, Jr. to do some checking. He reviewed the records of the different actions brought by and against the above mentioned members of the Jacob family. Appellant argued that the information contained in these records[7], which are in evidence before us, together with the information given him by Jacob, Jr., convinced him that Jacob, Jr. and Joyce had a cause of action against appellee and others based on the tort of "false imprisonment". Thus, appellant prepared the petition containing the defamatory statements on behalf of Jacob, Jr. and Joyce.
The record shows that appellant never did confirm the information given him by Jacob, Jr., with Joyce. Further, appellant testified that he has never communicated with Joyce, but relied on authority given him by Jacob, Jr. to file suit on her behalf. We have reviewed the records of the various lawsuits introduced in evidence and find that the following facts were available to appellant when he reviewed them:
Jacob, Sr. as lessor and Jacob, Jr. as lessee entered into a lease on September 20, 1974. The property leased consisted of the "Golden Wheel Nite Club" and the land on which it was located. Jacob, Sr. instituted an action "TO RECOVER PAST DUE RENT AND TO CANCEL LEASE" on February 6, 1975 against Jacob, Jr. in the action of Willie Jacob v. William Jacob, Jr., supra. Pursuant to a request by Jacob, Sr., made in that proceeding, the district court ordered the issuance of a writ of sequestration on February 6, 1975, directing the Sheriff of Iberia Parish to seize and hold the movables located within the "Golden Wheel Nite Club".
Appellant testified that when he reviewed the record of that action, he saw the sheriff's return showing that personal service had been made on Jacob, Jr. Thus, appellant knew that a writ of sequestration had been issued and served on Jacob, Jr. prior to his arrest on February 28, 1975, for having unlawfully entered the "Golden Wheel Nite Club". That record also shows that the trial court rendered judgment in that proceeding cancelling the lease between Jacob, Jr. and Jacob, Sr. and, further, that Jacob, Jr. was ordered to pay $500.00 in past due rent for the months of December, 1974 and January, 1975. This Court affirmed the trial court's judgment in Jacob v. Jacob, 320 So.2d 334 (La.App. 3 Cir. 1975), which was handed down October 17, 1975.
Appellant testified that he researched the law pertaining to the tort of "false imprisonment" prior to the time he prepared the petition. As noted, the Louisiana Supreme Court, in Kyle v. City of New Orleans, supra, summarized the earlier jurisprudence regarding the tort of "false imprisonment" and stated on page 971 that, "False arrest and imprisonment occur when one arrests *1138 and restrains another against his will without a warrant or other statutory authority. Simply stated, it is restraint without color of legal authority."
Appellant testified that he failed to check with either the District Attorney's office for the Sixteenth Judicial District or the Iberia Parish Sheriff's Department or the New Iberia City Court to see if in fact arrest warrants had been issued for Jacob, Jr. and Joyce. Had he done so, he would have found that on February 26, 1975, at 9:42 P.M., the Iberia Parish Sheriff's Department received a complaint by telephone that the "Golden Wheel Nite Club" was open, and being operated by Jacob, Jr. and Joyce, after it had been padlocked pursuant to the writ of sequestration. The complaint was telephoned in by Jacob, Sr. and verified by Deputy Vic Delcambre and Lt. Lloyd Sigue of the Iberia Parish Sheriff's Department. Appellant would also have learned that on February 24, 1975, Deputy Delcambre made two affidavits reciting the facts observed by him and Lt. Sigue before the New Iberia City Court. Further, on February 28, 1975, the New Iberia City Court issued two arrest warrants based on these affidavits, one for Jacob, Jr. and the other for Joyce, and these two defendants were arrested that same day. This information clearly shows that the accusations made in the pleadings prepared by appellant were false and that Jacob, Jr. and Joyce had no cause of action against appellee for "false imprisonment".
In summary, appellant had knowledge of certain facts, which called into question the verity of the information given him by Jacob, Jr., prior to his preparation of the petition containing the defamatory allegations. Yet, appellant failed to investigate sources readily available to him which would have shown that the information given him by Jacob, Jr. was false.
Appellant testified that in preparing the petition he also relied on a handwritten note by Henry A. Bernard, Jr., an attorney practicing in New Iberia. Bernard's secretary had given the note to Jacob, Jr., who presented that note to appellant on his first visit. In essence, the note indicates that Jacob, Jr. should have an attorney prepare a quick suit for illegal arrest and wrongful imprisonment with malice. It states that the petition should ask for several hundred thousand dollars in damages and that this should be done immediately to stop prescription. It concludes by stating that the petition could later be amended to show particulars, but that Bernard could not do the filing at the time.
Appellant testified that he telephoned Mr. Bernard before preparing the petition. He stated that the note, together with the information given him by Bernard and Jacob, Jr., led him to the conclusion that he should formulate the petition, as he did, and that he should name appellee as a defendant therein. Bernard testified that he did write the note and instruct his secretary to give it to Jacob, Jr. But, he stated that he did this because he really didn't care to represent Jacob, Jr. and that he knew from past experience that Jacob, Jr. would take up too much of his time, if he met with him. Bernard admitted talking with appellant on the telephone and stating to him that he thought that the $5,000.00 bonds set for Jacob, Jr. and Joyce were extremely high. Bernard said that it was hard for him to recall just what the details of the telephone conversation were. However, he emphatically stated that he did not tell appellant that appellee should be made a defendant to the action.
The allegations of paragraph 4 of the petition are to the effect that Jacob, Jr. and Joyce were wrongfully imprisoned at an exorbitant bail figure, set and obtained at the instance of appellee and others. Yet, appellant testified that Jacob, Jr. told him on his first visit that both he and Joyce had been released on their own recognizance on the Monday following the Friday on which they had been arrested.[8]
*1139 Finally, we note that appellant makes much of the fact that he had very little time within which to file the suit. Yet, he did have the rest of the day Thursday, February 26, 1976, the date on which he went to New Iberia to do some checking, after talking with Jacob, Jr., plus all day Friday and all of the following Monday to check to see if what Jacob, Jr. had told him was in fact the truth. Appellant never explained why he failed to use this extra time for that purpose.
We find that appellant breached his duty to appellee to make a reasonable investigation of the information given him by Jacob, Jr. before preparing and publishing the judicial pleading containing the statements which were clearly defamatory, if false.
Finally, we must inquire whether the risk and harm caused were within the scope of protection afforded by the duty. The risk and harm encountered by appellee were that defamatory material was communicated to a large number of people in the community where appellee practices his profession and caused him to suffer injury to his professional reputation. Additionally, appellee suffered personal injury, i.e., mental pain and anguish, mortification, humiliation, and embarrassment. These personal injuries resulted from his fear of the damage done to his professional reputation by the widespread dissemination of the defamatory statements.
Appellee introduced in evidence clippings from the "Morning Advocate", the "Daily Iberian", and the "Daily Advertiser", which all reproduced the defamatory material contained in the petition prepared by appellant. There was also testimony that the defamatory material had been telecast on KLFY-T.V. and KATC-T.V., both television stations broadcasting over a wide area in which appellee lived and practiced his profession. Also, the testimony indicated that the defamatory material had been broadcast over KANE Radio Station, which is located in New Iberia.
We find that the risk and harm encountered by appellee as a result of appellant's conduct were within the scope of protection afforded by appellant's duty to appellee. Thus, we find appellant liable to appellee for the damages suffered by appellee as a result of appellant's negligent conduct.

PRIVILEGE
Appellant contends that the trial court erred in finding that he was unable to benefit from an absolute privilege or, in the alternative, a qualified privilege for the defamatory statements made by him in a judicial pleading.
This Court, in Foster v. McClain, 251 So.2d 179 (La.App. 3 Cir. 1971), writ denied, 259 La. 883, 253 So.2d 216 (1971), stated on page 181 that:
"It is well established in our jurisprudence that the absolute privilege attached to judicial allegations by the common law has no place in the law of Louisiana. The jurisprudence of this State makes it clear that judicial allegations are entitled only a qualified privilege. However, for the privilege to be effective, the statements must be material to the case, they must be made with probable cause to believe they are true, and they must have been made without actual malice. Waldo v. Morrison, 220 La. 1006, 58 So.2d 210 (1952); Bienvenu v. Angelle, 254 La. 182, 223 So.2d 140 (1969)."
The Louisiana Supreme Court, in Lescale v. Joseph Schwartz Co., 118 La. 718, 43 So. 385 (1907), had occasion to explain its earlier decision in Lescale v. Joseph Schwartz Co., 116 La. 293, 40 So. 708 (1905). Both involved the same defamation action based on allegedly defamatory statements contained in a petition. The court in the earlier decision reversed the trial court and overruled an exception of no cause of action.
*1140 The later decision in Lescale, supra, stated on page 385 of 43 So.:
"Defendant excepted that the allegations were privileged, they having been made in the course of judicial proceedings and having been material to the issue, and that therefore plaintiff's petition did not show a cause of action. This exception was sustained by the trial court, but was overruled by this court; this court holding that a defamatory allegation in a judicial proceeding is actionable, though material to the issue, if false and malicious and made without probable cause." (Emphasis provided.)
We have found the defamatory statements contained in the petition prepared by appellant to be false. Thus, under the express holding of Lescale, cited above with emphasis, it makes no difference whether the defamatory allegations were material to the issues in the present action. See also Foster v. McClain, supra; Cotonio v. Guglielmo, 176 La. 421, 146 So. 11 (1933).
The second element, which appellee must prove to negate the qualified privilege, is that appellant made the defamatory allegations without probable cause to believe they were true. We have shown in our negligence analysis that appellant had no probable cause to make these defamatory allegations. Thus, we find the second element proved.
Finally, appellee must prove that the defamatory allegations were made with malice. We note that in Foster v. McClain, supra, this Court held that a plaintiff must prove that defamatory statements, otherwise subject to a qualified privilege, were made with "actual malice". We find that this was error. The Louisiana Supreme Court, in Waldo v. Morrison, 220 La. 1006, 58 So.2d 210 (1952), was faced with an issue concerning the nature of the qualified privilege accorded defamatory statements contained in a brief filed in a judicial proceeding. Waldo stated on page 211 that:
"We have had numerous actions of this type in the history of our jurisprudence. While there was a conflict in the earlier cases, the rule has been settled since, Lescale v. Joseph Schwartz Co., 116 La. 293, 40 So. 708, that the common-law rule of absolute privilege has no place in the law of Louisiana; the privilege is, rather, qualified, and is subject to the rule that the comment made must be material, with probable cause and without malice." (Emphasis provided.)
Thus, it can be seen that there is no requirement that the person claiming the benefit of a qualified privilege be shown to have made the defamatory statements with "actual malice" for the purpose of holding that he may not claim the benefit of that privilege. As was noted in 12 La. Civil Law Treatise: Tort Doctrine; Stone, F.F. § 181, supra, "Malice may destroy an otherwise valid privilege".
The Louisiana Supreme Court, in Cotonio v. Guglielmo, supra, had before it a defamation action which arose out of the appearance of certain defamatory statements in a petition filed in a proceeding attacking the validity of a will. Defendants to the defamation action plead the existence of a qualified privilege. Cotonio, in discussing the requirement of the presence of malice to negate the privilege, stated on page 13 of 146 So.:
"With respect of malice, it is unlikely that defendants bore any actual malice or ill will towards plaintiff. He was a stranger to them. Actual malice, however, is unnecessary to sustain the action for libel. Malice, arising from the publication of a false and injurious charge, without probable cause for thinking the charge is true, suffices. This malice, which constitutes legal malice, need not be proved. The law imputes it to the publisher of a libel from the act of publication. Weil v. Israel, 42 La.Ann. 955, 8 So. 826."
In the action before us, appellant published a false and injurious charge, without probable cause for thinking that the charge was true, when he prepared and transmitted to Jacob, Jr. the petition containing the defamatory statements directed towards the appellee. Thus, malice is imputed to him.
*1141 We find that appellant cannot claim the benefit of the qualified privilege accorded those who make defamatory statements in the course of judicial proceedings.

QUANTUM
Appellee has answered this appeal and contends that the trial court's award of $5,000.00 for general damages sustained by him as a result of appellant's negligent conduct constitutes an abuse of that court's "much discretion" in making such awards. Appellee contends that this sum is grossly inadequate and that this Court should raise it to $100,000.00.
LSA-C.C. Article 1934(3) provides in pertinent part:
"... In the assessment of damages under this rule, as well as in cases of offenses, quasi offenses, and quasi contracts, much discretion must be left to the judge or jury, ...."
The Louisiana Supreme Court, in Reck v. Stevens, 373 So.2d 498 (La.1979), reiterated the methodology to be utilized by the appellate courts of this State in reviewing general damage awards made by a trial court. Reck stated on page 501:
"Thus, the initial inquiry must always be directed at whether the trier court's award for the particular injuries and their effects upon this particular injured person is, a clear abuse of the trier of fact's "much3 discretion," La.Civ.C. art. 1934(3) in the award of damages. It is only after articulated analysis of the facts discloses an abuse of discretion, that the award may on appellate review, for articulated reason, be considered either excessive, Carollo v. Wilson, 353 So.2d 249 (La.1977); Schexnayder v. Carpenter, 346 So.2d 196 (La.1977), or insufficient, Olds v. Ashley, 250 La. 935, 200 So.2d 1 (1967). Only after such determination of abuse has been reached, is a resort to prior awards appropriate under Coco for purposes of then determining what would be an appropriate award for the present case."
We have already noted that the evidence shows that the defamatory statements contained in the pleadings prepared by appellant and transmitted by him to Jacob, Jr. were widely disseminated throughout the area where appellee lives and practices his profession by newspaper, television and radio. The evidence indicates that appellant gave Jacob, Jr. two copies of the petition, one to file and one for Jacob, Jr. to keep. Appellant testified that he did not release any of the information contained therein to the news media.
In Giordano v. Tullier, 139 So.2d 15 (La. App. 4 Cir. 1962), the court had before it an action for malicious prosecution of a suit filed in Federal District Court and for an alleged libel contained in pleadings therein. The trial court rendered judgment in favor of plaintiff and defendant appealed. One of the objections raised by the defendant on appeal was that the trial court had erred in admitting in evidence certain newspaper articles appearing in the daily newspapers of New Orleans, which carried reports of the action in Federal District Court. Defendant contended that the rule is that the original author of a libelous publication is not to be held liable for the voluntary republication or repetition thereof by others.
Giordano disagreed and found on page 19 that:
"An exception to this rule exists where the republication is the natural and probable consequence of the defendant's act. See 53 C.J.S. verbo Libel and Slander § 85, at page 137; 53 C.J.S. verbo Libel and Slander § 264(d) at page 382; 33 Am.Jur. verbo Libel and Slander Sec. 197 at page 185."
We find that the widespread newspaper, television, and radio dissemination of the defamatory statements contained in the petition was the natural and probable consequence of appellant's act in naming Gerard H. Wattigny, the Sheriff of Iberia Parish at the time, as a defendant to the action. Certainly the naming of an important local public official, such as a sheriff, as a defendant to a suit provides all the incentive needed for the news media to give widespread coverage to the allegations contained therein.
*1142 Appellee and his wife, Jean B. Wattigny, testified at the trial of this action. Their testimony was that appellee had done everything humanly possible to segregate himself, his affairs, and his reputation from that of his father, as Sheriff of Iberia Parish, and the Iberia Parish Sheriff's Department. They stated that they first learned of the filing of the suit and the allegations made therein when this information was broadcast by the news media shortly after the filing thereof. Thereafter, they were repeatedly questioned by friends, relatives, and some of appellee's clients as to appellee's involvement in the lawsuit. Rumors began to circulate as to the nature of appellee's involvement.
Appellee and his wife testified that it was like a nightmare coming true as they had worked so hard to separate themselves from the politics surrounding appellee's father and the Iberia Parish Sheriff's Department. Further, the furor that erupted with the filing of the lawsuit continued for a period of approximately three years and caused great anxiety for appellee and his wife during that period of time. This anxiety caused problems in appellee's family, and appellee began to suffer from insomnia, a problem he had never been bothered with before. Appellee testified that during the time that his father was Sheriff, he voluntarily refrained from handling any criminal cases in which the Iberia Parish Sheriff's Department was involved in any manner. He stated that from 1967 to 1980, he represented the Iberia Parish Sheriff's Department in civil matters but never accepted any fee or salary for that representation. Appellee explained his refusal to handle criminal cases by stating that he did not want his reputation to suffer from any type of gossip, or any type of allegations that because his father was Sheriff, they were railroading people or that they were getting people off through their relationship. We quote the following excerpt from the testimony given by appellant to show that what appellee feared the most was present in the lawsuit filed against him:
"Q. Before I get to that. With all this information you've told me about, did the fact that Mr. Wattigny, the plaintiff in this case, had a relationship with the sheriff, who was the boss of these various deputies who had done these things, as far as Jamall had told you, happened to be father-son? Did that have any effect on your thinking in the case?
A. Most certainly. Even though I did not practice extensively in this parish, or in the parish in which Sheriff Wattigny was sheriff, his reputation preceded him into Lafayette parish. Knowing that, young Jerry was the father of the high sheriff, Jerry
Q. Reverse that statement.
A. Led me to believe that there could very well be the collusion either between young Jerry and the sheriff, or more than likely between young Jerry and the officers who were involved.
Q. That'd be the deputy working for the sheriff?
A. The deputies. And the deputies were not going to be about to do anything that would offend the high sheriff's son.
Q. Now, you said young Jerry was the father of the sheriff.
A. Young Jerry'sI still don't know the initials. Gerard B is young Jerry, and Gerard H is
Q. Which one is the father, which one is the son?
A. Is the high sheriff, Gerard H.
Q. The sheriff was the father?
A. Yes, sir, the sheriff was the father."
Finally, appellee testified that he suffered from a great deal of anxiety resulting from his worries as to the effect that the defamatory allegations would have on his professional reputation and practice. He stated that for approximately three years after the lawsuit was filed, he had to continually explain to his insurer and the local insurance agency the nature of the claim being made and the facts and circumstances surrounding that claim.
*1143 Our analysis of the facts regarding the particular injuries suffered by the appellee and their effects upon him leads us to the following conclusions. First, appellee had done everything possible in his attempt to avoid giving even the appearance of any impropriety in his relationship with his father and the Iberia Parish Sheriff's Department. Second, that the defamatory allegations published by the appellant were to the effect that such impropriety did exist, which allegations have been shown to have been completely and utterly false. Third, that appellant formulated and published these defamatory allegations, with respect to appellee, without any scintilla of evidence, except for the uncorroborated information given him by Jacob, Jr. Fourth, that the defamatory allegations specifically set forth that which appellee feared the most, i.e., that he was involved with his father and the Iberia Parish Sheriff's Department in taking illegal actions against certain persons. Fifth, that appellee is an attorney, and therefore, the defamatory allegations were particularly injurious to him as they cast doubt on the integrity of his professional reputation. Finally, that appellee suffered severe mental anguish and pain for a long period of time as the defamatory allegations accused him of being involved in that which he had sought so hard to avoid, and that rumor and conjecture surrounding the allegations persisted long after their publication.
We find that the trial court's award of $5,000.00 in general damages for the injuries suffered by appellee constitutes a clear abuse of that court's "much discretion" in making such awards under the facts and circumstances surrounding the injuries suffered by appellee and their effect on him.
The Louisiana Supreme Court, in Coco v. Winston Industries, Inc., 341 So.2d 332 (La. 1976), stated on page 335:
"We do reemphasize, however, that before a Court of Appeal can disturb an award made by a trial court that the record must clearly reveal that the trier of fact abused its discretion in making its award. Anderson v. Welding Testing Laboratory, Inc., supra, [304 So.2d 351]; Bitoun v. Landry, supra, [302 So.2d 278]; Fox v. State Farm Mutual Automobile Ins. Co., supra, [288 So.2d 42]; Walker v. Champion, supra, [288 So.2d 44]. Only after making the finding that the record supports that the lower court abused its much discretion can the appellate court disturb the award, and then only to the extent of lowering it (or raising it) to the highest (or lowest) point which is reasonably within the discretion afforded that court. Bitoun v. Landry, supra; Spillers v. Montgomery Ward & Company, Inc., supra, [294 So.2d 803]. It is never appropriate for a Court of Appeal, having found that the trial court has abused its discretion, simply to decide what it considers an appropriate award on the basis of the evidence."
We have searched through the jurisprudence in an effort to discover cases that are "truly similar" in fact and circumstance to the action before us in an attempt to determine what would be an appropriate award for the present case. We are unable to find any. We are mindful of the admonition given by the Court in Coco on pages 335 and 336 that:
"Further we believe that, heretofore, courts of appeal have placed too much emphasis on their review of other reported decisions. Certainly no two cases are ever fully alike. And whether two cases are so similar as to produce like quantum judgments is hardly discernible by gleaning the facts of the comparable decision from simply a written opinion of an appellate tribunal. Of course, another factor bearing on this matter is that significant change has been, and is taking place in our society not the least of which are changes in economic conditions (particularly rampant inflation), fluctuating job categories, employment opportunities, and even lifestyles. Furthermore, it is impossible for an appellate court to judge what evidence in a particular case was given special weight by the finder of fact."
*1144 Further, we are aware of the U.S. Supreme Court's admonition in Gertz v. Robert Welch, Inc., supra, that:
"It is necessary to restrict defamation plaintiffs who do not prove knowledge of falsity or reckless disregard for the truth to compensation for actual injury. We need not define `actual injury', as trial courts have wide experience in framing appropriate jury instructions in tort actions. Suffice it to say that actual injury is not limited to out-of-pocket loss. Indeed, the more customary type of actual harm inflicted by defamatory falsehood include impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering." See 418 U.S., at 349, 350, 94 S.Ct., at 3011, 3012.
Thus, we recognize that, having found that the trial court abused its "much discretion" in making its award of general damages to appellee, we are restricted to raising that award to only the lowest point which is reasonably within the discretion afforded that court. Reck v. Stevens, supra; Coco v. Winston Industries, Inc., supra.
We further recognize that we may compensate the appellee only for the "actual injuries" he has suffered. Gertz v. Robert Welch, Inc., supra.
We find that $15,000.00 is the lowest amount which was reasonably within the discretion of the trial court in making its general damages award to appellee for the "actual injuries" suffered by him.
Because of our decision herein, we pretermit any discussion of the second issue raised by appellee in his answer to this appeal, which is whether the trial court erred in taking into consideration appellant's inability to pay in fixing the amount of its damage award. Suffice it to say that appellant never plead the defense of inability to pay nor has he argued such a defense either at the trial of this matter or on this appeal.
For the above and foregoing reasons, the judgment of the trial court is amended to award appellee $15,000.00 for general damages and is affirmed as amended.
All costs of this appeal are assessed against defendant-appellant.
AFFIRMED AS AMENDED.
SWIFT, J., concurs in the result.
NOTES
[1] We simply note that there are some who consider Gertz v. Robert Welch, Inc., supra, to be inapplicable to defamation actions brought against defendants not associated with the news media. See Rosen v. Reed, 351 So.2d 1284 (La.App. 1 Cir. 1977), per Judge Landry concurring; Mashburn v. Collin, supra, Footnote 32; Robertson, Defamation and First Amendment: In Praise of Gertz v. Robert Welch, Inc., 54 Texas L.Rev. 199, 215 (1976).

Support for this view can be found in Gertz v. Robert Welch, Inc., 418 U.S., at 332, 94 S.Ct., at 3003 where the Court frames the principal issue before it in terms of whether a newspaper or broadcaster that publishes defamatory falsehoods about an individual who is neither a public official nor a public figure may claim a constitutional privilege against liability for the injury inflicted by those statements. Further, in Gertz v. Robert Welch Inc., 418 U.S., at 347, 94 S.Ct., at 3010, where the Court holds that so long as they do not impose liability without fault, the states may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual. Finally, in explaining the constitutional standard set out above, the Court in Gertz v. Robert Welch, Inc., 418 U.S., at 348, 94 S.Ct., at 3011 states that the standard recognizes the strength of the legitimate state interest in compensating private individuals for wrongful injury to reputation, yet shields the press and broadcast media from the rigors of strict liability for defamation.
[2] LSA-R.S. 14:26 provides in pertinent part:

"§ 26. Criminal conspiracy
A. Criminal conspiracy is the agreement or combination of two or more persons for the specific purpose of committing any crime; provided that an agreement or combination to commit a crime shall not amount to a criminal conspiracy unless, in addition to such agreement or combination, one or more of such parties does an act in furtherance of the object of the agreement or combination.
If the intended basic crime has been consummated, the conspirators may be tried for either the conspiracy or the completed offense, and a conviction for one shall not bar prosecution for the other."
[3] LSA-R.S. 14:46 provides in pertinent part:

"§ 46. False imprisonment
False imprisonment is the intentional confinement or detention of another, without his consent and without proper legal authority."
[4] The Code of Professional Responsibility is Article XVI of the Articles of Incorporation of the Louisiana State Bar Association as restated. See LSA-R.S. 37:Chapter 4Appendix.
[5] Ethical Consideration 2-30 provides in pertinent part that:

"EC 2-30 Employment should not be accepted by a lawyer when he is unable to render competent service or when he knows or it is obvious that the person seeking to employ him desires to institute or maintain an action merely for the purpose of harassing or maliciously injuring another...."
Disciplinary Rule 2-109 provides:
"DR 2-109 Acceptance of Employment.
(A) A lawyer shall not accept employment on behalf of a person if he knows or it is obvious that such person wishes to:
(1) Bring a legal action, conduct a defense, or assert a position in litigation, or otherwise have steps taken for him, merely for the purpose of harassing or maliciously injuring any person.
(2) Present a claim or defense in litigation that is not warranted under existing law, unless it can be supported by good faith argument for an extension, modification, or reversal of existing law."
Ethical Consideration 7-4 provides:
"EC 7-4 The advocate may urge any permissible construction of the law favorable to his client, without regard to his professional opinion as to the likelihood that the construction will ultimately prevail. His conduct is within the bounds of the law, and therefore permissible, if the position taken is supported by the law or is supportable by a good faith argument for an extension, modification, or reversal of the law. However, a lawyer is not justified in asserting a position in litigation that is frivolous."
Ethical Consideration 7-10 provides:
"EC 7-10 The duty of a lawyer to represent his client with zeal does not militate against his concurrent obligation to treat with consideration all persons involved in the legal process and to avoid the infliction of needless harm."
Ethical Consideration 7-22 provides:
"EC 7-22 Respect for judicial rulings is essential to the proper administration of justice; however, a litigant or his lawyer may, in good faith and within the framework of the law, take steps to test the correctness of a ruling of a tribunal."
Disciplinary Rule 7-102 provides in pertinent part:
"DR 7-102 Representing a Client Within the Bounds of the Law.
(A) In his representation of a client, a lawyer shall not:
(1) File a suit, assert a position, conduct a defense, delay a trial, or take other action on behalf of his client when he knows or when it is obvious that such action would serve merely to harass or maliciously injure another.
(2) Knowingly advance a claim or defense that is unwarranted under existing law, except that he may advance such claim or defense if it can be supported by good faith argument for an extension, modification, or reversal of existing law...."
[6] LSA-R.S. 14:63.3, in effect at the time, provided in pertinent part:

"§ 63.3 Entry on or remaining in places after being forbidden
A. No person shall without authority go into or upon or remain in or upon or attempt to go into or upon or remain in or upon any structure, water craft or any other movable which belongs to another, including public buildings and structures, ferries and bridges, or any part, portion or area thereof, after having been forbidden to do so, either orally or in writing, including by means of any sign hereinafter described, by any owner, lessee, or custodian of the property or by any other authorized person. Providing however nothing herein contained shall apply to a bona fide legitimate labor organization or to any of its legal activities such as picketing, lawful assembly or concerted activity in the interest of its members for the purpose of accomplishing or securing more favorable wage standards, hours of employment and working conditions. For the purposes of this Section, the above mentioned sign means a sign or signs posted on or in the structure, water craft or any other movable, including public buildings and structures, ferries and bridges, or part, portion or area thereof at a place or places where such sign or signs may be reasonably expected to be seen."
[7] These records are from the civil actions of William Jacob, Jr. v. William Jacob, et al., Docket No. 34,794, Sixteenth Judicial District Court, Parish of Iberia, Louisiana; Willie Jacob v. William Jacob, Jr., Docket No. 35,620, Sixteenth Judicial District Court, Parish of Iberia, Louisiana; and Willie Jacob, Sr. v. William Jacob, Jr., Docket No. 36,689, Sixteenth Judicial District Court, Parish of Iberia, Louisiana.
[8] Judge Robert Johnson, District Judge, Division B, Sixteenth Judicial District Court, testified by deposition at the trial of this action. He stated that he set the bonds on Jacob, Jr. and Joyce at $5,000.00 each. He testified that he had no discussion whatsoever with appellee with respect to the fixing of these bonds. In fact, Judge Johnson stated that he did not believe that he had ever discussed the fixing of a bond with appellee. Judge Johnson's best recollection was that he had fixed the bonds at such a large amount because the defendants had defied a court order, which he considered to be a serious matter. The court order which they had defied was the writ of sequestration issued by order of Judge Johnson.